LITTLE (BANGS v.). See Case No. 839.

LITTLE (BLUNT v.). See Case No. 1,578.

## Case No. 8,394.

### LITTLE et al. v. GOULD et al.

[2 Blatchf. 165.] [1]

Circuit Court, N. D. New York. Feb. 27, 1851.

COPYRIGHT—COURT REPORTS — CONSTITUTION AND ACTS OF NEW YORK—"NOTES"—STATE REPORTER.

1. The provision of the 22d section of the 6th article of the constitution of the state of New York. adopted in 1846, that all "judicial decisions shall be free for publication by any person," is not repugnant to the constitution and laws of the United States.

2. Nor is the 2d section of the act of the legislature of the state of New York, passed April 9th, 1850 (Laws 1850. c. 245). which provides that "the copyright of any notes or references made by the state reporter" to any of the reports of the decisions of the court of appeals "shall be vested in the secretary of state for the benefit of the people" of the state, inconsistent with the said provision of the constitution of the state of New York.

[Cited in note to Gould v. Banks, 53 Conn. 415, 2 Atl. 886.]

3. The various acts passed in relation to the publication of the reports of the court of appeals of the state of New York.

4. The word "notes" in the said act of 1850, comprises the summary of the points decided by the court which immediately follows the title of the suit in each case reported. and the footnotes in the volume of reports, and the statement of the arguments of counsel.

[Cited in Banks v. Manchester, 23 Fed. 145; Banks v. West Pub. Co., 27 Fed. 61.]

5. The abstracts of the pleadings and the statements of facts, which form the basis of the decisions reported, are neither "notes" nor "references."

6. The "notes and references" intended by the act do not embrace such original notes and references as the reporter may see fit, of his own accord. to superadd to what would otherwise be, in themselves, complete reports of the cases reported by him.

7. As to what is covered by the word "references" in the act, quere.

8. In pursuance of law. the state reporter, the secretary of state and the comptroller of the state of New-York, contracted with L. that he should, during the term of five years, publish the decisions of the court of appeals. and have the exclusive benefit of the copyright to be taken out in behalf of the state, of the notes and references and other matter furnished by the state reporter connected with such decisions, which contract was therein declared to be an assignment and transfer to L. of the copyright of the matter so published. The contract was made after the passage of said act of 1850. The reporter was a salaried officer, appointed by the state authorities, under laws which declared that he should have no pecuniary interest in his reports, but that they should be published by contract, and that it should not be lawful for the reporter, or any other person within the state, "to secure or obtain any copyright for said reports of judicial decisions," but that the same might be published by any person. After said contract was made, the reporter prepared a volume of said reports, and the necessary steps to obtain a copyright for it under the acts of congress were taken in the name of the secretary of state of the state of New-York, in trust for said state. This volume was, during the five years, printed and published by L. under his contract. Subsequently, and during the five years, G. reprinted and published the volume: *Held.* on a motion by L. for a provisional injunction. that he was entitled to such an injunction restraining G. from publishing or selling any copies of the reports of cases argued and determined in said court, already published or to be thereafter published by L. in pursuance of his contract, containing any of the head-notes or summary statements of points decided, or any foot-notes, copied or taken or colorably altered from any book so published by L.

[Cited in Yuengling v. Schile. 12 Fed. 100; West Pub. Co. v. Lawyer's Co-operative Pub. Co.. 64 Fed. 364.]

[Cited in Nash v. Lathrop, 142 Mass. 39, 6 N. E. 563.]

9. Considerations stated, in regard to the granting of provisional injunctions.

This was a motion for a provisional injunction, founded upon a bill and affidavits. The plaintiffs [Edwin C. Little and Oliver Scovill] claimed the exclusive right to print, publish and sell a book entitled "Reports of Cases Argued and Determined in the Court of Appeals of the State of New-York, with Notes and References and an Index, by George F. Comstock. Counsellor at Law, Vol. III." They alleged that this right had been violated by the defendants [Anthony Gould and others]. and prayed an injunction to restrain its further infringement. The bill set forth that, in pursuance of an act of the legislature of the state of New York, passed May 12, 1847 (Laws 1847, p. 342, c. 280, § 73). Mr. Comstock was duly appointed reporter of the decisions of the court of appeals, under the official denomination of "State Reporter," and that he immediately entered upon the execution of his office; that, on the 1st day of September, 1850, he prepared the volume in question, the contents whereof were summarily described in the bill; that, by the laws of the state of New York, the state reporter was constituted a public officer, and was entitled to a salary in full compensation for his services as such reporter; that the original manuscript matter composed and written by him in virtue of his appointment, became the property of the people of the state of New York, and

---

[1] [Reported by Samuel Blatchford, Esq., and here reprinted by permission.]

that they were the legal assigns of Mr. Comstock of all such original manuscript; that, by the laws of the state of New York, the reports prepared by the state reporter were required to be published under his supervision, by contract to be entered into by him, in conjunction with the secretary of state and the comptroller of the state of New York, with such person as should agree to publish and sell the reports on the most advantageous terms to the public, and at a price not exceeding three dollars for a volume of five hundred pages, and to furnish to the secretary of state sixty-four copies of each volume of the reports, bound in leather; that, in pursuance of such law, on the 29th day of April, 1850, a contract was entered into by Mr. Comstock, state reporter, Christopher Morgan, secretary of state, and Washington Hunt, comptroller, with the plaintiffs, whereby it was agreed that the plaintiffs should, during the next ensuing five years, publish the decisions of the court of appeals, and have the exclusive benefit of the copyright to be taken out in behalf of the state, "of the notes and references and other matter furnished by the reporter connected with said decisions," which contract was therein declared to be "an assignment and transfer of the copyright of the matters so published" to the plaintiffs; and that the plaintiffs agreed to publish such decisions in the manner and on the terms required by law and specified in the contract, and to deliver the number of copies required by law, and ten additional copies to the reporter, for exchanges, and that they would at all times keep the work on sale at a price not exceeding two dollars and fifty cents per copy. The plaintiffs further averred that, by an act of the legislature of the state of New-York, passed April 9th, 1850, it was provided that the copyright of any notes and references made by the state reporter to the reports of the judicial decisions of the court of appeals should be vested in the secretary of state, for the benefit of the people of the state; that, on the 20th day of November, 1850, a printed copy of the title of the book in question was deposited in the office of the clerk of the district court of the United States, according to law; that the plaintiffs, by virtue of their contract with the state, were vested with the sole right to publish the original matter composed by Mr. Comstock and contained in the volume in question, and were entitled by law to be protected in the enjoyment of that right; that, on the 21st day of November, 1850, and in pursuance of their contract, the plaintiffs printed and published the work, and caused to be inserted and printed, on the proper page of each copy thereof, the words, "Entered, according to act of congress, in the year 1850, by Christopher Morgan, secretary of state, in trust for the state of New-York, in the clerk's office of the district court of the United States for the Northern district of New-York;" that, within three months from such publication, they delivered a copy thereof severally to the clerk of the district court, the librarian of the Smithsonian Institute and the librarian of the congress library; and that they had at all times kept, and still had on sale, a sufficient number of copies of the work for the use of the public, at the stipulated contract price; and that, with full knowledge of the facts set forth in the bill, and without the consent of the plaintiffs, the defendants had caused the work to be printed and published, and had sold many copies, and had on hand many copies thereof.

Accompanying the bill was an affidavit made by one of the plaintiffs, verifying an original letter thereto annexed, bearing date October 16th, 1850, and addressed to the governor and secretary of state of the state of New York, by the defendants, in which they avowed that they had commenced the printing, and were about to publish an edition of the work in question, describing it by its full title. The letter concluded as follows: "This notice is given, to the end that you may resort to any legal measures for the purpose of restraining our action, which you may be advised to take; and, in case you omit so to do forthwith upon the receipt of this notice, we will give the same in evidence on any motion you may subsequently make for an injunction or other process against us."

No formal answer had been put into the bill, but an affidavit sworn to by William Gould, one of the defendants, was read in opposition to the motion. in which it was stated that, after the sending of their letter to the governor and secretary of state, they proceeded with their enterprise therein mentioned, and prosecuted the same in the city of Albany, where the plaintiffs and the state officers also resided, without being notified by either of any objection to the further prosecution of their undertaking; that the defendants were abundantly able to pay many times the amount of any damages which could lawfully be awarded against them for the supposed injury complained of by the plaintiffs; that their books would furnish the ready means of ascertaining the number of copies of Comstock's Reports which they might sell; that the sale of their edition would be almost entirely defeated, and irreparable injury would be done to them, should an injunction be now allowed, while no damage not susceptible of ascertainment and compensation would accrue to the plaintiffs from the denial of an injunction; that they were advised by their counsel and believed they should be able to show that Mr. Comstock was not lawfully appointed state reporter, and that the people of the state of New York did not become his assigns; that the plaintiffs were not the legal assigns of the copyright of the book in question; that only a single number of the

volume described in the bill had yet been published by the plaintiffs; that Christopher Morgan, secretary of state, was not the author or the legal assign of the author of the work; that the defendants had acted in the premises in good faith, under the belief that they had the constitutional, legal and equitable right to do what they had done; and that, as they were advised by their counsel and believed, they had a good and substantial defence on the merits to all the matters contained in the bill.

John C. Spencer, Nicholas Hill, Jr., and John K. Porter, for plaintiffs.

Azor Taber and Otis Allen, for defendants.

CONKLING, District Judge. To maintain the denial by the defendants of the plaintiffs' title, their counsel rely mainly upon a provision contained in the constitution of the state of New-York.

By the constitution and laws of the United States, authors are invested with the exclusive right and liberty, for a limited period, of printing, re-printing, publishing and vending their books; and this right is extended to their executors, administrators and assigns. The right is held to belong to the reporters of judicial decisions in common with other authors, to the extent of their authorship in the composition of their works. It does not comprise the written opinions of the judges, because of these the reporter is not the author, and it has been said by the supreme court of the United States that the judges of that court cannot confer on the reporter of its decisions any copyright in the written opinions delivered by them.

Under this well-known state of the law of the land, as declared in the constitution and statutes of the United States, and by the authoritative interpretations they had received, the people of the state of New-York saw fit, in 1846, by the 22d section of the 6th article of the constitution adopted in that year, to ordain as follows: "The legislature shall provide for the speedy publication of all statute laws, and of such judicial decisions as it may deem expedient. And all laws and judicial decisions shall be free for publication by any person." According to the interpretation given by the counsel for the defendants to the second member of this section, its direct and sole design was, so far as judicial decisions are concerned, to secure to all persons the right to do precisely what the court is now called upon to restrain the defendants from doing—the right to re-print and sell, ad libitum, any volume of reports published in pursuance of any law of the state enacted in obedience to the injunction contained in the first branch of this section. The counsel insist, therefore, that the act of April 9th, 1850, mentioned in the bill of complaint, purporting, to a limited extent, to invest the secretary of state, for the benefit of the people of the state, with the copyright of reports to be prepared by the state reporter, is unconstitutional and void.

One of the answers given to this objection is, that the expression "judicial decisions," occurring in the last member of this section of the constitution, does not admit of being restricted to the sense thus ascribed to it; but that the provision embraces, by its very terms, "all" judicial decisions, whether required by law to be published or not, and would extend, therefore, to the reports which have been, and are likely to continue to be, published, of the decisions of other courts of the state of New York, as well as to the reports now in controversy. And it is rightly argued that, if this is the true construction, and if it is true, also, that the absolute common right intended to be secured was that of re-printing reports prepared and published by others, it would follow that this provision of the constitution of the state of New York is repugnant to the constitution and laws of the United States, and, therefore, void; for, it is undeniable that a state cannot in any form interfere in this respect with the rights of private persons. For this reason, unless this interpretation of the language of the state constitution is unavoidable, it ought to be rejected; and, after carefully considering the ingenious argument of the counsel for the defendants, designed to show that the judicial decisions referred to in the last member of the section under consideration, are such only as shall be designated by the legislature for publication in obedience to the first part of the section, I am of opinion that this proposition cannot be maintained. It is inconsistent with the phraseology actually used, and with the omission of words which, if such an interpretation had been intended, would naturally have been employed. The words "all judicial decisions" must be held to mean what they naturally import—not all such judicial decisions only as the legislature should direct to be published, which is what they do not import. It follows, then, that if the license designed to be secured to all persons, extends to the re-printing of all reports prepared and published by others, notwithstanding a copyright may be asserted therein by the author, this provision is obnoxious to the objection that it transcends the limits of state authority, and is, consequently, invalid. It is necessary, therefore, as already observed, to seek for it some other interpretation which, while consistent with the language of the provision, and with its spirit, so far as that can be discerned, shall be consistent also with the constitution and laws of the United States; and, in my judgment, there is no serious difficulty in finding such an interpretation, although it may be no easy task to discover the precise nature of the evil against which the provision was designed to guard.

On looking into the proceedings of the convention, I observe that this section was pro-

posed by a member, after the adoption, on the same day, of a resolution to arrest all further debate on the article relating to the judiciary, and, having been decided by the president to fall within the scope of this resolution, the vote upon it was taken immediately, without explanation or debate, and it was adopted by a majority of twenty-seven. Its language is mandatory, and it is addressed to the legislature. It directs: (1.) That provision shall be made by law for the speedy publication of all statute laws, and of such judicial decisions as the legislature may deem expedient; and (2.) that all laws and judicial decisions shall be free for publication by any person. This last direction is obviously intended to promote and extend the design of the first. This design was expressed in the section as originally proposed and adopted, by the addition, to what now stands as the first sentence, of the words, "so as to render the same easy of acquisition by the people;" and then followed, separated only by a semi-colon, the words which now stand as the second sentence. The words just quoted were expunged in the process of final revision, doubtless because they were seen to be wholly unnecessary, the object being too apparent to require elucidation, and a period was substituted for the semi-colon. I have narrated the history of this section, not because it appears to me to shed much light upon the question under consideration, but because it is relied on by the counsel for the defendants to support the interpretation on which they insist. A deliberate review of their argument on this point has failed to convince me of its soundness. The just view of the subject appears to me to be this. The first part of the section having peremptorily enjoined the speedy publication of the more authoritative and important judicial decisions of which it most concerned the public to be speedily apprised, the rest was left to private enterprise; but, lest some impediment should be thrown in the way, (not by the claim on the part of the author to copyright, which was beyond the power of the convention,) but by the legislature or the courts, or in some other way not easily divined, it was, by the second part of the section, ordained that no such restriction should be imposed. and it was made the duty of the legislature, if necessary, to see that this should not be done. In other words, it was declared, not that when one person had performed the labor of preparing, and incurred the expense of printing from manuscript, a volume of reports, any other person should be at liberty, in spite of the author or his assignee, to intercept and appropriate, or destroy, the just rewards of the enterprise, by rapaciously seizing upon the book and re-printing it, but that the right to engage in such original enterprises should remain common to all. Assuming this, as I feel warranted in doing, to be the just interpretation of this constitutional provision, I dismiss it from further consideration.

But it is further objected by the counsel for the defendants, that, conceding the validity of the act of April 9th, 1850, in virtue of which the copyright of the book in question is claimed by the plaintiffs, still the defendants are not chargeable with any infringement of this right, because, as they argue, the book does not contain any thing which can properly be denominated "notes or references," to which alone a copyright in behalf of the people of the state of New-York is asserted by the act. The answer given to this objection by the learned counsel for the plaintiffs is, that the prohibition contained in this act against the securing or taking by any person of a copyright for the reports of cases decided by the court of appeals, with the exception therein mentioned, is in conflict with the provisions of the constitution and laws of the United States securing, absolutely, to authors and their assignees, the exclusive right to the fruits of their intellectual labors. But to this it may be replied, that Mr. Comstock having consented to accept and hold his office, and to prepare the book in question for the press, under a law of the state expressly declaring that he should have no pecuniary interest in the work, and that no copyright should be taken therefor, except to a limited extent by the secretary of state, for the benefit of the people of the state, must be considered as having surrendered his rights as author, and was incompetent to confer them on another; or, it may be said—which, however, would be little else than the assertion of the same principle in a different form—that the rights and disabilities of his office being prescribed by law, are to be regarded as conditions of the tenure by which it was held, which were binding upon him, and which a court of justice ought not to aid him in violating. But it is to be further observed, that the enjoyment of the right in question is by law made to depend, except in the case of an unpublished manuscript, upon the condition of taking certain steps demonstrative of the author's intention to insist upon his rights in this respect, and adapted to convey notice to all others of such intention, and that, if he omits this precaution, he is to be deemed to have abandoned his claim to protection. Now, in the present case, the author has not complied with this condition. It is said, indeed, that Mr. Morgan is the assignee of the rights of the author, and, as such, has taken the required measures for their security. But Mr. Morgan acted, throughout, in a fiduciary and representative character, as the agent of the people of the state of New York, and in execution of a trust imposed upon him by law. And it thence follows, I think, that he could not in that character acquire, and that he was therefore incompetent to convey to the plaintiffs, any rights cognizable in a judicial tribunal, except those of which, according to the terms of the laws under which he acted,

he was to become the recipient. To this extent, however, it may be assumed, as I do not understand it to be denied, that he might lawfully act, and that his acts ought to be held valid and effectual by this court, provided the laws under which he acted are, as I hold them to be, not inconsistent with the constitution of the state of New York. It becomes necessary, therefore, in the next place, to ascertain the limits of the authority vested in the secretary of state, in trust for the people, by the act of April 9th, 1850; and, for this purpose, before proceeding to notice more particularly the provisions of this act, I propose to advert to some antecedent enactments relating to the subject.

At the session of the legislature next after the adoption of the constitution, an act was passed providing for the appointment, by the governor and lieutenant-governor, of a reporter of the decisions of the court of appeals, to be denominated "State Reporter," who should hold his office for three years, unless sooner removed by the concurrent vote of both branches of the legislature. This act (Act May 12, 1847, c. 280, §§ 73, 74) contains the following enactment: "The reporter shall have no pecuniary interest in such reports, but they shall be published by the secretary of state, under the supervision of the reporter, by contract to be entered into, pursuant to the provisions of the act, entitled 'An act in relation to the public printing,' passed March 5, 1846. Such contract shall be made with the person who, in addition to furnishing the said secretary sixty-four copies of each volume of said reports, bound in leather, as soon as may be after the same is prepared, shall agree to publish and to sell them at the lowest price by the number and volume, according to the pages therein contained; such reports shall be published in numbers every second month. And the reporter shall prepare for each volume such digests and tables of contents as are usually prepared for similar reports. If the reporter shall neglect to discharge his duty faithfully, it shall be the duty of the said court to report that fact to the legislature, to the end that he may be removed from office. The reporter shall not practise as an attorney, counsellor or solicitor in any court." Of the copies to be delivered to the secretary of state, the act requires one copy to be by him delivered to the clerk of each county of the state. It was under this act that Mr. Comstock, as alleged in the bill, was on the 27th day of December, 1847, appointed state reporter. By another act, passed on the same day, the salary of this officer had been fixed at the sum of $2,000 [Laws N. Y. 1847, p. 312].

By an amendatory act passed April 11th, 1848, the mode of appointing the state reporter was changed by the association of the attorney-general with the governor and lieutenant-governor for that purpose, and it was again enacted that the reporter should "have no pecuniary interest" in the reports to be prepared by him as such reporter, but that the same should "be published under the supervision of the reporter, by contract to be entered into by the reporter, secretary of state and comptroller, with the person or persons who, in addition to furnishing the said secretary of state with sixty-four copies of each volume, shall agree to publish and sell the said reports on terms the most advantageous to the public, and at a rate not exceeding the price of three dollars for a volume of five hundred pages, regard being had to the proper execution of the work." The 3d section of this act is as follows: "§ 3. It shall not be lawful for the reporter, or any other person within this state, to secure or obtain any copyright for said reports, notes or references, but the same may be published by any persons." It may not be amiss here also to recite the remaining provisions of this act. They are contained in the 4th section, and are as follows: "As often as the reporter shall have prepared for publication sufficient of the said reports, with notes and references, to constitute two hundred and fifty pages of the usual size of law reports, he shall cause the same to be published in pamphlet form, with such headings as will appear in the bound volumes, and shall furnish a copy thereof to each county clerk's office at the expense of the state, and keep the same on sale at contract prices for all persons who may want to purchase; such printing to be done by the person who shall contract to publish the reports under this act, at and in proportion to the prices stipulated in his contract." Act April 11, 1848, c. 224.

The only remaining enactments which it is necessary to notice, are contained in an act to amend that last cited, the third section of which is thereby declared to be amended so as to read as follows: "§ 3. It shall not be lawful for the reporter, or any other person within this state, to secure or obtain any copyright for said reports of the judicial decisions of the court of appeals, but the same may be published by any person." The act further provides: "§ 2. The copyright of any notes or references made by the state reporter to any of said reports shall be vested in the secretary of state, for the benefit of the people of this state." Act April 9, 1850, c. 245.

Now, the question is whether, according to the proper construction of the words, "any notes or references made by the state reporter to any of said reports," contained in the last mentioned act, these words comprise any, and, if so, what portion or portions of the volume in controversy. The counsel for the defendants strenuously insist they are referable exclusively to such original notes or references as the state reporter might see fit, of his own accord, to superadd to what would otherwise be in themselves complete reports of the cases by him reported; and the example of the late Mr. Justice Cowen, while reporter to the supreme court of the state of

New-York, to whom the profession were so much indebted for the learned essays with which his great industry and love of jurisprudence impelled him to accompany his reports, is adduced as an example.

The words "notes or references," as we have seen, first occur in the act of April 11, 1848, c. 224. By the 3d section of that act, the state reporter and all other persons are expressly forbidden "to secure or obtain any copyright for said reports, notes or references;" and the 4th section directs the immediate publication of the reports, from time to time, as often as "the said reports, with notes and references," shall be sufficient to make two hundred and fifty pages. Now, it is to be observed, that the words in question, in the sense in which they are understood by the counsel for the defendants, import nothing that has ever been supposed to pertain to the business of reporting judicial decisions, and nothing, therefore, which a reporter has ever done except at his own option merely. It is what few reporters have in fact done to any considerable extent, and what others have altogether omitted. There is nothing in either of the statutes relative to the subject, expressive of any design to exact this kind of labor of the reporter, and nothing in any other part of them indicative of any expectation that he would engage in it. It was what the state reporter might, perhaps, lawfully do, to a moderate extent, if he should see fit, but what he certainly was at liberty to omit at his pleasure, and what it could not therefore reasonably be assumed he was likely to undertake. It was what, if he should perform it, would be the fruits of his extraordinary labor, and that to the pecuniary profits of which, therefore, he would in justice be exclusively entitled. Without stopping, then, to inquire whether the legislature had the power, is it probable that it entertained the design to deprive him of the reward due to his enterprise and learning? And, having done this by the prohibition contained in the 3d section of the act, is it probable that it would have been assumed, as it seems to have been done in the next succeeding section, that the reporter would nevertheless gratuitously accompany his reports with such notes or references? I am of opinion that these questions must be answered in the negative; and, unless the words in question are to receive a different interpretation in the act of April 9th, 1850, which, to the extent of its provisions, must govern the rights of the plaintiffs, so far as they depend on state legislation, it follows that the rights with which the act invests the secretary of state, are not restricted to the narrow limits insisted on by the counsel for the defendants. The two acts being in pari materia, the presumption is strong that the words "notes or references" were not designed to be used in different senses. But, in truth, the interpretation which they appear to me,

as I have already stated, to require in the act of 1848, is fortified, in its application to them, in the act of 1850. This act declares, that the copyright of any notes or references made, &c., shall be vested in the secretary of state, for the benefit of the people. Now, bearing in mind the nature of the notes or references of which the words of the act are supposed by the defendants' counsel to be descriptive, and the improbability that the reporter would even take the trouble to make them at all, is it to be imagined that the legislature thought it worth while, to say nothing of the injustice of doing so, solemnly to claim them as the property of the state? I think not; and it follows, therefore, that these words were intended to designate some portion or portions of the reports, constituting an essential ingredient of their integral composition, and which the state reporter, as such, was therefore bound to supply. The next question, then, is—what part or parts of the reports are to be considered as comprised by these words? And herein lies the chief difficulty of determining their true interpretation.

The word "note" has many significations. Among the fifteen definitions given of it by Webster, the greatest lexicographer of the English language that has yet appeared, the twelfth is this: "Annotation; commentary; as the notes in Scott's Bible; to write notes on Homer." This is the definition insisted on by the defendants' counsel, but which, for the reasons already assigned, I hold to be inadmissible. The third definition given by Dr. Webster is this: "A short remark; a passage or explanation in the margin of a book;" and his fourth definition is this: "A minute, memorandum or short writing, intended to assist the memory." These are all the definitions which it is pertinent to notice, and the two last mentioned furnish, in my opinion, the proper guide in determining the scope of the word "note" in the statute. That it comprises the summary of the points decided by the court, which immediately follows the title of the suit in each case reported, and the foot-notes, in the volume in question, is indubitable. Does it embrace, also, the arguments of counsel? The process by which this portion of the report of a case is prepared, is well known. The arguments are unwritten, and addressed to the court ore tenus, and a minute or memorandum, or short writing, intended to assist the memory of the reporter, is made by him at the time, from which he constructs the arguments which ultimately appear as one of the constituent elements of his report. I am of opinion, therefore, that they ought to be adjudged to fall within the scope of the expression, "any notes made by the reporter." The only remaining portions of the matter contained in the book in question, (which I understand to be, in fact, the first part of volume 3 of Comstock's Reports, this being all that I have seen, and all that the

defendants in their affidavit admit to have been published,) that are susceptible of being made the subject of copyright, even independently of the state law, are the abstracts of the pleadings and statements of facts, which form the basis of the decisions reported. These can, in no proper sense, be denominated "notes," nor am I able to perceive that they fall under the denomination of "references." If the book contains anything embraced by this latter word, it is the table of contents, entitled "cases reported," which consists of the titles of the suits comprised in the book, with references to the several particular pages where the cases are to be severally found. This constitutes but a very inconsiderable portion of the work; and, as it would be inapplicable to a reprint, unless its pages corresponded exactly with those of the original, I presume it has not been appropriated by the defendants, though I have not seen their book.

It appearing, from this review of the course of state legislation, that a copyright in the work in dispute was reserved to the people of the state, and the authority to secure it for their benefit vested in Mr. Morgan, the next question for consideration is, whether, in virtue of the contract with the plaintiffs, set forth in their bill of complaint, they obtained such a title to the subject of the controversy as is requisite to enable them to maintain their suit.

In some of the English cases to which I am referred, it is said that, to entitle a plaintiff to an injunction, in a case of this nature, he must establish a valid legal title to the copyright. Undoubtedly, when he relies upon a legal title, he is bound to set it forth, and it must appear to be at least primâ facie valid. But, it has also been held, that there are cases in which an equitable title is sufficient to entitle its possessor to protection in this form. In the present case, an agreement has been entered into between the plaintiffs and certain officers of the state, designated by law for that purpose, the author of the work in question and the secretary of state being of the number, by which it is stipulated that, upon the terms therein mentioned, the plaintiffs shall have the exclusive right to the publication of the decisions of the court of appeals, and to the benefit of the copyright to be taken out in behalf of the state therefor, during the period of five years. By an act of the legislature then recently passed, it was declared that the copyright of certain specified portions of the reports of such decisions should be vested in the secretary of state, for the benefit of the people of the state. With respect to the particular manner in which this right should be made advantageous to the people, the act was not explicit. This was left, therefore, measurably, to the discretion of the secretary. He and his associates were, however, expressly required by law to see that the reports were speedily published

and exposed to sale at a price not exceeding three dollars per volume. Perhaps they would have been authorized to contract for their publication and sale at that price, on condition that the publisher would pay a certain sum to the state for the privilege, provided a suitable person could have been found willing to become a party to such a contract. But they saw fit, and in strict accordance with the policy adopted by the legislature, of providing a sufficient supply of the reports at moderate prices, so to use the copyright as to make it conducive to that end, by offering to confer the emoluments arising therefrom, for a portion of the period during which it was to continue, on the publisher who would agree to furnish the required supply of the reports at the lowest prices. The plaintiffs having, as it is to be presumed, offered the most favorable terms, the contract was made with them, they stipulating to publish and sell the reports at the very low rate of two dollars and fifty cents for a volume of five hundred pages.

It is objected, that this contract was entered into before the book in controversy was prepared for the press. But, from the nature of the case, this could not have been otherwise without incurring delays subversive of the policy of the laws under which the agents of the state were acting. It seems clear, therefore, without pursuing the subject further, that these gentlemen, in entering into this contract, acted in strict accordance with the laws of the state, and that the plaintiffs are justly entitled to all the benefits arising from it which the state could confer. If it is not valid and effectual to the extent contended for by the plaintiffs, it is altogether nugatory, and the plaintiffs must seek redress, not from a judicial tribunal, for the violation of their copyright, but from the state, for the breach of its plighted faith. It is true they are not the assignees of the entire privilege reserved by the state, of asserting a copyright to the volumes of the reports to be prepared by the state reporter, as they shall be successively issued from the press, through all future time; but, to the beneficial interest in the copyright of the volumes to be published during the stipulated term of five years, it was designed to give them a perfect title. So far as this could be done by the supreme authority of the state, it has been done; and I am not aware of any grounds on which I should be warranted in deciding that it has not been done effectually. If it has not been, it must be because the subject is not in its nature susceptible of municipal regulation. But, in the compact between the state and the state reporter, by which the latter relinquishes and the former assumes the copyright in the reports, I can discern nothing inconsistent with the constitution and laws of the United States. It may be regarded as an assignment by operation of law. Can it be successfully contended,

that the exclusive right guaranteed by the laws of the Union has in this instance become extinct? If not, it must have vested in the state, and passed temporarily to the plaintiffs, who alone, at the present time, are competent to enforce it. Assuming this to be so, I think it follows that the plaintiffs have shown themselves to be in possession of a title to the work in question, of which this court is bound to take cognizance. Indeed, there is no want of precedent in our own courts on this point, if it were necessary to invoke it. Thus, in the case of Folsom v. Marsh [Case No. 4,901], which was a bill in equity to restrain the infringement of Dr. Sparks' copyright in the writings of Washington, the interest claimed by the plaintiffs was described in the bill to consist in their having "assumed a part of the risk and responsibility of publishing the said work;" and the suit was maintained, and a perpetual injunction awarded.

Under this view of the substantial merits of the controversy, it remains only to determine whether an injunction ought to be withheld for the reasons so earnestly addressed by the learned counsel for the defendants to the discretion of the court. It certainly must be conceded that the case involves questions by no means entirely free from obscurity and doubt; and if, as the counsel seem to suppose, this ingredient of itself always constitutes a conclusive objection to the grant of a provisional injunction to restrain an alleged piracy of a copyright, the only duty which would remain to me, after making this concession, would be the simple denial of the motion. But it is for the express purpose of resolving doubts with respect to the rights and responsibilities of parties, that courts are instituted; and, even on a motion of this nature, it is not every kind or degree of doubt that will absolve a judge from the responsibility of deciding questions presented for his consideration, much less from the labor of investigation and reflection. It must, at least, be a serious doubt, which remains after the faithful application of his faculties to its solution. If it were otherwise, this form of redress would be illusory. Doubts affecting a plaintiff's title may arise either from uncertainty with respect to the facts, or with respect to the law on which the title depends. In the present case, I do not understand that there is any dispute concerning the facts—certainly none respecting which there is any probability, not to say possibility, that any conflicting evidence could be adduced. There is nothing, therefore, which it would be proper to submit to the decision of a jury. The questions on which the rights of the parties depend are questions of law, arising mainly out of certain provisions contained in the constitution and statutes of the state of New York, and these questions the court is bound, at some stage of the controversy, to decide. But it is objected that they are new,

never having been settled by acquiescence, or by the adjudication of any court. An injunction in a case of this kind, it is said, has never been granted in England without a trial at law; and it is broadly intimated that to do it in this case would be iniquitous. It would, it is argued, be to prejudge the case, to decide it, and to award execution before trial. These are grave objections, and, if well founded, certainly ought to be held to be decisive. But it is because these questions have never before been judicially determined, that they are now before this court for decision; and, with respect to the practice of English courts of chancery, of sending pure questions of law to be settled in a suit at law, the adoption of this practice by the circuit courts of the United States would, for obvious reasons, be an absurdity. As to the assertion that, to allow an injunction now, would be to decide the cause without a trial, it is proper to remind the counsel that the case has already been elaborately argued; and it is easy to see that its legal features are not likely to be essentially changed by the substitution of a formal answer for the affidavit of one of the defendants. The parties, therefore, have already had a trial of the only kind they ever can have while the question is not, as it would be on a final hearing, whether the defendants should be perpetually enjoined, but whether this shall be done temporarily, leaving them at liberty, if they see fit, to re-argue the case on a final hearing.

If any additional reasons were wanting why I should not hold myself at liberty fastidiously to decline the responsibility of giving effect to the conclusions at which I have, however doubtingly, arrived, by granting an injunction, such reasons might easily be found in the demerits of the defendants. There can be no injustice in assuming that they have acted with full knowledge of all the facts detailed in the bill of complaint. Their extraordinary letter, already mentioned, shows this. They are chargeable, therefore, not only with a wilful and apparently very discreditable encroachment upon the rights of the plaintiffs, but with openly arraying themselves against the supreme authority of the state. There may possibly be circumstances, growing out of a spirit of rivalry between the parties, affording some palliation for conduct apparently so unjust and audacious; but of this I know nothing, and it may at least be safely assumed that they can furnish no shadow of justification to the defendants.

I am of opinion, therefore, that the plaintiffs are entitled to an injunction, restraining the defendants, their agents, servants and workmen, until the further order of the court, from further printing, publishing, selling, or otherwise disposing of any copy or copies of the reports of cases argued and determined in the court of appeals of the state of New-York, already published or to

be hereafter published by the plaintiffs in pursuance of their contract with the state set forth in their bill, containing any of the head-notes or summary statements of points decided, or any arguments of counsel, or any foot-notes. copied, taken or colorably altered from any book so published by the plaintiffs.

[A subsequent motion, after answer, to dissolve the provisional injunction was denied. Case No. 8,395.]