## MYERS v. CALLAGHAN and others.

*(Circuit Court, N. D. Illinois.    February 5, 1881.)*

1. COPYRIGHT—STATE REPORTER.

   In the absence of any express legislation by the state indicating a contrary principle, a state reporter is entitled to a copyright in his volumes of reports for what is the work of his own mind and hand, notwithstanding it may be true that he can have no copyright in the opinions of the court.

2. SAME—CONSTRUCTION OF STATUTES.

   The various provisions of law in relation to copyright should have a liberal construction, in order to give effect to what may be considered the inherent right of the author to his own work.

3. BANKRUPTCY—RIGHTS OF BANKRUPT.

   A bankrupt has a right to pursue all proper legal measures for the the protection of his interests until an assignee of his estate has been appointed.—[ED.

In Chancery.

*J. V. Le Moyne,* for complainant.

*J. L. High* and *Thomas Moran,* for defendants.

DRUMMOND, C. J.   This is a bill filed by the plaintiff against the defendants for an infringement of the rights of the plaintiff under the copyright laws of the United States.   The bill alleges substantially the following facts:  From 1865 to 1868 the plaintiff and Horace P. Chandler constituted a business firm for publishing law books, and as such firm they became the proprietors of volumes 32, 33, 34, 35, 36, 37, and 38 of the Illinois Reports.   Norman L. Freeman was the reporter, under the law and by the appointment of the court, of the volumes of reports; and the firm purchased all the proprietary rights of Freeman, and paid him a valuable consideration therefor, he agreeing that the firm should have the copyright of all said books.   The firm published a considerable number of copies of each of said volumes.   In 1868 Chandler sold out all his interest to the plaintiff.   The plaintiff was also the proprietor of, and entitled to the copyright in, volumes 39, 40, 41, 42, 43, 44, 45, and 46 of the Illinois Reports, of which Freeman was also the reporter, and from him the plaintiff purchased all his interest in those volumes.   The plaintiff has

published a large number of copies of each of these last-named volumes, and still has the copyright to all his volumes of reports from 32 to 46, inclusive. In 1877 the plaintiff reprinted volumes 37 and 38, and, as some changes were made in the arrangement of paging the books, a copy of the printed title of each volume, and afterwards copies of the books themselves, were deposited in the office of the librarian of congress. The defendants had full knowledge of the exclusive rights of the plaintiff, and attempted to buy the same from him, but refused to pay the price demanded, and thereupon reprinted and published the volumes 32 to 38, inclusive, using the material contained in the volumes of the plaintiff, thereby violating the law of congress upon the subject of copyright; not confining themselves to the use of the opinions of the court, but using the head-notes and statements of cases prepared by Mr. Freeman, making colorable changes, thus trying to avoid the plaintiff's rights under the law. The defendants threaten also to republish other volumes copyrighted by the plaintiff, viz., volumes 39 to 46, inclusive, of said reports. These acts, done and threatened by the defendants, have caused and will cause damage to the plaintiff, and therefore he asks that the defendants may be enjoined from publishing or selling any of the said books, and that the same so published may be forfeited to him, and that the defendants be required to deliver them up, and that an account may be rendered by the defendants of all the books published or sold, and that the defendants may pay the damage and costs which the plaintiff has sustained by their wrongful acts.

To this bill various defences have been set up. It is claimed that these being volumes of reports by a reporter, acting under the authority of law as a public officer, are not the subject of a copyright under the act of congress. It is also claimed, if they are the subject of copyright, the plaintiff ha not complied with the act of congress in the procurement of the copyright, and therefore none exists. It is insisted, too, by the defendants, that the volumes which are charged to be an infringement of the plaintiff's copyright, are themselves independent productions of different editors and annotators,

Messrs. Ewell and Denslow, who were employed by the principal defendants, Messrs. Callaghan & Co., to edit those volumes. It is also said that the plaintiff has acquiesced in the publication of the volumes of the defendants, and that he has lost the right to maintain a suit by his own laches; and, lastly, that the plaintiff has been adjudicated a bankrupt, and therefore cannot maintain this action. It will be observed that the plaintiff claims through a purchase from the reporter. He was an officer of the state, and prepared the volumes under the authority of law, and it is insisted, because he was a public officer and acted in an official capacity, that he had no copyright in these volumes. In one aspect of the case there would seem to be great force in this objection. For example, if an adequate compensation was paid by the state to the reporter for the work done by him in preparing volumes of reports, then whatever property there was in the volumes arising from the labors of the reporter ought to belong to the state and not to him; but I cannot find that view was taken of the case by the state and the court in the appointment of the reporter at that time. On the contrary, it seems to have been considered that the reporter was entitled to any profits which might arise from the sale of these volumes, and that they constituted a part of the perquisites of his office. He was appointed under the authority conferred by section 20 of chapter 29 of the Revised Statutes of 1845, which required the court to appoint a reporter. Mr. Freeman was appointed under the act of 1863, and re-appointed in 1869, and then there appears to have been no regular salary. The office seems to have been different then from what it is now, when, it is said, adequate compensation is given by the state to the reporter for the services performed by him.

The case of *Wheaton* v. *Peters*, 8 Peters, 591, as construed by the courts and the profession, has always been supposed to decide that Mr. Wheaton had a copyright in his reports, provided he had complied with the law then in force upon the subject. It is true that a majority of the court does not distinctly assert that he had that right, but it appears to be necessarily implied from the whole reasoning in the opinion of

the majority of the court, because the court remanded the case for the purpose of ascertaining whether the reporter had complied with the acts of congress; something which clearly ought not to have been done, provided the court was of the opinion that in no event was the reporter entitled to a copyright in his reports. Every reporter of the supreme court since has claimed copyright,—Peters, Howard, Black, Wallace, and Otto—and so, it is believed, has every reporter in this country, state and federal. It seems to me, therefore, that we must assume, in the absence of any express legislation by the state indicating a contrary principle, that the reporter is entitled to a copyright in his volumes of reports for what is the work of his own mind and hand,—the head-notes, the statements which he has made in each case of the facts, and of the arguments of counsel,—notwithstanding it may be true that he can have no copyright in the opinions of the court.

The copyright of these volumes of reports existed, if at all, under the act of congress of 1831, which provided that any one, in order to be entitled to the benefit of the act, must deposit before publication a printed copy of the title of the book in the clerk's office of the district court of the district where the author or proprietor should reside; and, within three months from the publication of the book, a copy of the same must be delivered to the clerk of said district. Section 4. He must cause to be inserted in each copy of the book, on the title-page or the page immediately following, the following words: "Entered according to Act of Congress, in the year ——, by A. B., in the Clerk's Office of the District Court of ————." Section 5.

Various objections are made by the defendants to the copyright because of non-compliance by the plaintiff with the provisions of the act of congress. It appears that 553 copies of volume 32 were delivered by Mr. Freeman, the reporter, to the state on October 2, 1865, while the proper certificate of that volume was not delivered to the clerk of the district court until January 17, 1866; and it is insisted that the delivery of these volumes to the state constituted a publication. There seems to be no further evidence on the subject

than what arises from the fact of the delivery to the state. Whether they were distributed by the state, or retained until after the proper certificate was entered in the clerk's office of the district court, does not appear. It is argued that the delivery to the state constituted *per se* a publication within the meaning of the statute; and, as the certificate was filed after the delivery to the state, there was no copyright to the volume for that reason. These were copies for the use of the state, and subject to distribution under the provisions of law. Sections 23, 24, c. 29, Rev. St. 1845. Can we assume, in the absence of any evidence upon the subject, that a distribution was made? Mere printing of a book is not necessarily publication, and I am inclined to think it was incumbent upon the defendants to show something more than a mere delivery of the copies to the state.

The title-page of volume 34, together with the printed volume itself, seems to have been filed in the clerk's office of the district court on the twenty-third of October, 1866, and it is claimed that this does not show that a proper certificate was filed in the clerk's office, as required by the statute, before publication. It will be observed that the statute does not specify how long before publication the certificate should be filed. Here both acts seem to have occurred on the same day, and the presumption, I think, is, in the absence of any evidence to the contrary, that the filing of the certificate of title preceded the deposit of the volume in the clerk's office.

The title-page of volume 35 was deposited with the clerk of the district court in January, 1867, and the note printed in the volume states that it was "entered according to act of congress in the year 1866." There is no doubt this is a mistake in the imprint of the entry, as it should have been 1867, instead of 1866. The statute does not require that the note of entry should indicate the day or the month, but only the year; and if it be true that this mistake is fatal, then, of course, as to that volume the copyright is lost.

But I do not feel inclined to give so rigid a construction to the statute. The case of *Baker* v. *Taylor,* 2 Blatchf. 82, is cited as being conclusive against the validity of the copyright in

this volume. That was a case which arose, like this, under the act of 1831. The title of the book was deposited with the clerk in 1846, and the notice of the entry, as printed in the book, stated that it had been made in 1847, and there was evidence tending to show the plaintiffs knew of the error before publication. That was an application for an injunction, which the court refused, holding that these facts deprived the plaintiffs of their copyright in the book under the act of congress, notwithstanding the date may have been a mistake. The main difference between that case and this is that here the entry states that the title was deposited in 1866, when, in fact, it was not deposited until 1867. The mistake arose probably from the volume having been printed in 1866, and it was assumed that the certificate of the title-page was filed in the proper office that year. It may be admitted that there is no distinction in principle between that case and this; but it seems to be rather a hard rule to deprive a party of the product of his labor simply because a mistake of this kind has been made. The author or publisher has endeavored to comply in good faith with the provisions of the statute, but has committed an error, unintentionally, it is presumed, in stating the year. According to the imprint contained in the book in this case, the right would expire before it would according to the filing of the certificate of the title with the the proper officer; and therefore it would seem no one could be damnified by the error which was committed. In *Baker v. Taylor* the court held there should be an exact compliance in every particular with the provisions of the statute, and the court remarks that in *Wheaton v. Peters* the supreme court decided there must be a strict compliance with the provisions of law. I do not understand that the court has laid down the rule with such unbending rigor as seems to be implied in the case cited. Undoubtedly a majority of the court in the case of *Wheaton v. Peters* held that the law must be complied with; but they do not say that if there shall be a slip in any trifling particular, therefore the author is deprived of all right to the product of his brain and of his hand. Conceding that it is a right which must exist under the law, the

question is whether, if that is substantially in good faith complied with, it is not sufficient. It seems to me that it is.

It may be admitted, therefore, that every person who claims a copyright to a book, conferred by act of congress, must show that the provisions of the act have been complied with. But there is what may be called the original right of the author. It is the object of the act of congress to "*secure*" the right which thus primarily exists. Indeed, statutes of copyright seem to imply the existence of a natural right of the author to the product of his brain. They are passed in order to make that right after publication, in the language of the constitution, "exclusive." So that I am not inclined to agree with the strict construction which has been placed on the acts of congress by some of the courts. It seems to me, on the contrary, that these various provisions of law in relation to copyright should have a liberal construction, in order to give effect to what may be considered the inherent right of the author to his own work.

It will be recollected that a majority of the judges, when the question first came before the court of King's Bench in England as to the right to literary property, held it existed at common law, independent of the statute of Anne; and this ruling was reversed by the house of lords, that court holding the right existed only by virtue of the statute; and that this opinion of the highest appellate court of England was followed by the supreme court of the United States in the case of *Wheaton* v. *Peters*. But it may be affirmed with some confidence that the decisions of both courts were considered by text writers and the profession as rather trenching upon the inherent rights of authors.

There are other objections to the copyright, as that the name of Myers is alone used in the entry, and the title filed with the clerk does not show the name of the publisher. But these do not appear to be sustained in law or fact.

In considering the question of the infringement of the copyright by the defendants, it must be borne in mind what is the character of the work. They are reports of the decisions of the supreme court of this state, to which no one can have a

copyright; but he may have to the head-notes and statements of each case, and of the arguments of counsel. These head-notes and statements which have been made are in themselves an abridgment: the one of the opinions of the court, consisting of the principles of law decided; and the other, an abstract of the facts and of the arguments.

It should also be stated that the volumes of the defendants, as edited by those employed by them, are very much condensed, as compared with Mr. Freeman's reports, and yet the paging of the volumes is substantially the same throughout, so that the cases in the corresponding volumes appear on the same page. The list of cases which precedes each report is the same. The defendants Ewell and Denslow, who were employed by the other defendants to annotate these decisions or reports, both state upon examination that their work was independent of that of Mr. Freeman; but it appears from the evidence that all the volumes of Mr. Freeman were used in thus editing or annotating; and although it may have been their intention to make an independent work, it is apparent, from a comparison of the Freeman volumes and those of the defendants, that the former were used throughout by the editors employed by the defendants. It is true that in each volume, perhaps in the majority of cases, there is the appearance of independent labor performed by them, without regard to the volumes of Mr. Freeman; but yet, in every volume, it is also apparent that Mr. Freeman's volumes were used; in some instances words and sentences copied without change; in others, changed only in form; and the conclusion is irresistible that, for a large portion of the work performed in behalf of the defendants, the editors did not resort to original sources of information, but obtained that information from the volumes of Mr. Freeman. Undoubtedly it was competent for an editor to take the opinions of the supreme court, and possibly from the volumes of Mr. Freeman, and make an independent work; but it is always attended with great risk for a person to sit down, and, with the copyright of a volume of law reports before him, undertake to make an independent report of a case. It is not difficult to do this, going to the

original sources of information, to the decisions of the court, the briefs of counsel, the records on file in the clerk's office, without regard to the regular volumes of reports. Any one who has tried it can easily understand the difference between the head-notes of two persons, equally good lawyers, and equally critical in the examination of an opinion, where they are made up independent of each other; and, bearing in mind this fact, it seems to be beyond controversy that, although in many, and perhaps most, instances there is a very considerable difference between the head-notes of the defendants' volumes and those of the plaintiff, the latter have been used in the preparation of those of the former. I conclude, therefore, that the defendants have, in the preparation of those volumes from 32 to 38, inclusive, of the Illinois Reports, used the volumes of the plaintiff so as to interfere with his copyright.

When this bill was filed an application was made to the district judge for an injunction against the defendants. That was refused, and I am inclined to think properly refused. There is, no doubt, considerable testimony in this case to show that the plaintiff did not insist so sharply upon his rights under the law as he should have done during the various interviews which took place when negotiations were pending between the parties for the sale of the plaintiff's right to these volumes to the defendants. There is some conflict in the evidence, but, taking it all together, there cannot be said to have been any consent on the part of the plaintiff to the publication made by the defendants. On the contrary, it would seem as though his conduct showed that he never intended absolutely to abandon what he considered his legal rights, under the law, to the publication of these volumes of reports. He in fact published some of them, and gave notice of the publication of others. This shows that he had no intention to abandon his rights. Perhaps an explanation of some expressions used by the plaintiff, and of his conduct, may be found in the supposition that they would come to terms, and that he would sell and they would buy whatever rights he had. But, admitting that the plaintiff was not

so decided as he ought to have been, it must be also said that there was a good deal in the talk, and in the declarations of the defendants, which seemed to concede the rights claimed by the plaintiff, those of copyright among others; and in such a case as this, where there is a question of abandonment of a clear legal right once existing, acquiescence, or laches, the testimony ought to be reasonably conclusive of the fact before a court of equity would deprive a party of his rights under the law. I do not think that testimony exists in this case, and therefore I hold that there was not that consent given by the plaintiff, or that abandonment of his rights, or acquiescence, or laches, which are claimed by the defendants.

The only other defence is that of the bankruptcy of the the plaintiff. The answer made to that, and which seems to be satisfactory, is that until there is an assignee appointed of the bankrupt's estate he has the right to pursue all proper legal measures for the protection of his interests. So that on the whole I think that the plaintiff is entitled to a decree in this case.

### DECREE.

This cause coming on for final hearing on the bill, answers, and testimony, and the court being fully advised, finds:

That the complainant is the owner of the copyright or exclusive right of publication of the volumes described in said bill of complaint, and known as volumes thirty-two, (32,) thirty-three, (33,) thirty-four, (34,) thirty-five, (35,) thirty-six, (36,) thirty-seven, (37,) and thirty-eight (38,) of the Illinois Reports.

That said defendants Bernard Callaghan, Andrew Callaghan, Andrew P. Callaghan, Sheldon A. Clark, violated said copyright of said complainant, and to said volumes 32, 33, 34, 35, 36, 37, and 38, by publishing, offering for sale, and selling copies thereof, and the said Marshall D. Ewell and V. B. Denslow in editing the same.

Wherefore, it is ordered and decreed that all said defend-

ants be perpetually enjoined from further publishing or selling, transferring or removing, any of said books.

And as it does not appear what number of said volumes have been published by said defendants Bernard Callaghan, Andrew Callaghan, Andrew P. Callaghan, and Sheldon A. Clark, or the value of said complainant's volumes before the illegal publication and sale by the said defendants of the copies thereof, it is ordered that this matter be referred to Henry W. Bishop, one of the masters of this court, to ascertain and report what number of each of said volumes have been printed, and what number have been sold, and at what price, by said last-named defendants, and that the defendants last named may be examined in regard thereto, and they may be required to produce their account-books and papers, and that said master also ascertain and report what was the market value of each of said books of complainant prior to the said illegal publication of said books by the defendants last named.

And also what was the actual cost or value of reprinting and binding each of said volumes; and that, upon the making of such report, said complainant have leave to apply for a further order in regard to the damages to be allowed for the said illegal publication and sale of said volumes.

And the solicitor for complainant having made application herein, upon the suggestion that since the filing of the bill in this cause said defendants last named have proceeded to publish and sell copies of the books described in said bill as volumes Nos. 39, 41, 42, 43, 44, 45, and 46 of said Illinois Reports, and upon the further suggestion that such publication is in violation of the rights of said complainant, it is ordered that he have leave to file a supplemental bill herein in regard thereto.