BANKS & BROS. *v.* WEST PUBLISHING Co. and another.[1]

*(Circuit Court, D. Minnesota.   April, 1886.)*

1. COPYRIGHT—RIGHT OF STATE IN OPINIONS OF JUDGES.
     Whether a state, by virtue of the common law, has, or by the copyright acts of congress can acquire, any property right in the opinions of the judges of its supreme court, discussed, but not decided.

2. SAME—REPORTS OF JUDICIAL OPINIONS—WHAT PROTECTED.
     It is in accordance with sound public policy, in a commonwealth where every person is presumed to know the law, to regard the authoritative expositions of the law by the regularly constituted judicial tribunals as public property, to be published freely by any one who may choose to publish them, and such publication may be of everything which is the work of the judges. The copyright of the volume does not interfere with such free publication, as it protects only the work of the reporter.

3. SAME—PUBLICATION OF IOWA DECISIONS—STATUTES AND CONTRACT CONSTRUED.
     The Iowa statutes of 1873 and 1880, and the contract made with complainant under the authority of the act of 1880, construed, and *held* that the opinions of the judges of the supreme court of that state are free to all; that the copyright to be obtained for the benefit of the state was intended to protect only the completed volumes; and that no right of complainant is violated by the publication of the opinions by another publisher in advance of the official reports.

---

[1] Reported by Robertson Howard, Esq., of the St. Paul bar.

In Equity.

This is a suit brought by the complainants to restrain the defendant from publishing the opinions of the supreme court of Iowa, the complainants claiming that the exclusive right of such publication is vested in them. The Northwestern Reporter, in which are published these opinions, as well as those of the supreme courts of other northwestern states, was first issued by the defendant in 1879, and has been since a continuous weekly publication. It is this publication of opinions which the complainants seek to enjoin. The exclusive right of complainants is claimed by virtue of a contract with the state of Iowa of date July 8, 1880, full compliance with whose terms is alleged. The statute, chapter 60, Laws Iowa 1880, under which the contract was made, and such portions of the laws of 1873 as define the duties of clerk and reporter in respect to the opinions and Reports, are as follows:

Whereas, by the provisions of chapter 60 of the Acts of the Eighteenth General Assembly of the state of Iowa, the executive council is authorized to contract for the printing and publishing of the reports of the opinions of the supreme court of Iowa; and whereas, the said executive council, in accordance with the provisions of section 4 of said chapter, did publish in six different newspapers, published in different localities in the said state, weekly for six weeks, commencing on the first week in April, A. D. 1880, a notice to the effect that sealed proposals would be received at the office of the secretary of state, for stereotyping, printing, publishing, and selling the said Reports for the term of eight years, from the first day of June of said year, at a certain rate per volume, to be stated in said proposals, the bids to be received on or before 12 o'clock, noon, of May 31, 1880; and whereas, Banks & Bros., before the said first day of June, 1880, and after the publication of said notice, to-wit, on the thirty-first day of May, 1880, did, before noon of said day, in accordance with said notice and the law, deposit with the secretary of state their sealed proposal as follows:

"To enter into a contract for stereotyping, printing, publishing, and selling the reports of the decisions of the supreme court of Iowa for the term of eight years from the first day of June, 1880, as required by and subject to the provisions of chapter 60 of the Eighteenth General Assembly of Iowa, the same being an act entitled 'An act to provide for the stereotyping, printing, publishing, and sale of the Supreme Court Reports, and to repeal sections 155, 156, 157, and 160, c. 4, tit. 3, of Code, and to fix the salary of the supreme court reporter,' for the sum of ninety-four cents per volume; and we attach hereto the receipt of the treasurer of the state of Iowa, showing that we have, in compliance with section 5 of said act, deposited with him the sum of one thousand dollars, to be forfeited to said state of Iowa on failure to enter into said contract, as required by said act.

"BANKS & BROTHERS,
"Per JOSEPH G. JENNINGS,
"Attorney in Fact."

—Therefore, know all men by these presents, that, in consideration of the foregoing premises, said Banks & Bros. hereby agree with the state of Iowa that they will stereotype, print, publish, and sell the reports of the supreme court of the state of Iowa, in accordance with the provisions of said chapter 60 of the Acts of the Eighteenth General Assembly, said chapter being herein referred to as a part hereof, for the term of eight years from and after the first

day of June, 1880. Said Banks & Bros. further agree to deliver to the secretary of state, at the capitol, at Des Moines, 250 copies of each volume of said Reports free of cost of publication or delivery, at the earliest practicable time, and within 60 days after the delivery of the manuscript for any one copy of such Reports to them; that they will stereotype the same, and at all times keep said Reports on sale in the state of Iowa to residents of said state, for actual use, at the price of 94 cents per volume, in suitable quantity, in the city of Des Moines; that they will furnish the state any number of additional copies that may be required for its own use, at said price, and will procure new stereotype plates whenever the original plates shall become defaced or destroyed. The said Banks & Bros. further agree that they will not take out in their own name, nor in the name of any other person than the secretary of state of the state of Iowa, a copyright for any one of the volumes published under this contract, but that they will take out the copyright in the name of the secretary of state as aforesaid; and they hereby covenant that, in case they should take out a copyright for any one of said volumes in the name of any other person than said secretary of state, they will forfeit and pay to the state of Iowa the sum of $2,000 for each breach of this contract. Said sum of $2,000 is hereby agreed on as liquidated damages for each breach of said covenant.

It is further agreed by the said Banks & Bros. that if it is determined in any action on their bond, given for the faithful performance of this contract, that they have failed in any respect to comply with the provisions of said chapter 60, or of this contract, the executive council may declare the contract forfeited; and that upon such forfeiture so declared they will, upon demand, transfer to the secretary of state of the state of Iowa, for the use of said state, the stereotype plates of each volume of said Reports published under this contract, or, in default, will pay to the treasurer of the state of Iowa $2,000 for each of such volumes, as liquidated damages for failure to make such transfer.

It is agreed on the part of the state of Iowa that the reporter make a volume as provided for in section 1 of said chapter 60,—copies of such opinions, with syllabus, with statement of facts involved, and legal propositions made by counsel in the arguments, with authorities cited,—and within 20 days after the proof-sheets for a volume are furnished to said reporter at his office in Des Moines, Iowa, by said Banks & Bros., it is agreed that said reporter shall furnish to the said Banks & Bros. an index and table of cases to such volume.

The said Banks & Bros. further agree to furnish to the reporter, as soon as they may be issued, two copies of the revised proof-sheets of the opinions, head-notes, indexes, and table of cases of each volume, for correction and approval by the judges of the supreme court, and will cause such corrections to be made as indicated by the judges.

It is further agreed and understood that each of said volumes of Reports shall contain not less than 750 nor more than 800 pages, exclusive of table of cases and index, and said Banks & Bros. further undertake and agree that the workmanship and quality of material in said volumes of Reports published by them under this contract shall in every respect be equal to that of the first issue of volume 40 of Iowa Reports; and, further, that each of said volumes published under this contract shall be approved and accepted by a majority of the judges of the said supreme court of Iowa.

It is further agreed that the said Banks & Bros., their successors and assigns, shall have the right to the exclusive publication and sale of each of said volumes of Reports so long as they shall in all respects comply with the requirements of the act hereinbefore mentioned in respect to the character, sale, and price of such volume, and the copyright of the Reports published under this contract shall rest in the secretary of state for the benefit of the people of the state of Iowa, in accordance with section 2 of said act.

In witness whereof, the said Banks & Bros. and the executive council of

the state of Iowa have hereunto set our hands this eighth day of July, A. D.
1880.                                     BANKS & BROTHERS.

Signed and witnessed, as to Banks & Bros., June 24, 1880.

                                JOSEPH G. JENNINGS.
                    JOHN H. GEAR, Governor.
                    J. A. HULL, Secretary of State.
                    B. R. SHERMAN, Auditor of State.
                    GEO. W. BEMIS, Treasurer of State.

(*Title III., Iowa Code* 1873, *page* 26.)

CHAPTER 2.

OF THE CLERK OF THE SUPREME COURT.

Sec. 146. The office of the clerk of the supreme court shall be kept at the seat of government, and he shall keep a complete record of all proceedings of the court.

Sec. 147. He must not allow any written opinion of the court to be removed from his office except by the reporter, but shall permit any one to examine or copy the same, and shall, when required, make a copy and certify to the same.

Sec. 148. He shall promptly announce by letter any decision rendered to one of the attorneys of each side when such attorneys are not in attendance at the place of court.

Sec. 149. He shall record every opinion rendered by the court as soon as filed, and shall perform all the duties pertaining to his office.

CHAPTER 4.

OF THE SUPREME COURT REPORTER.

Sec. 154. When the opinions filed at any term of the supreme court are recorded by the clerk, the reporter may take and retain the same for a period not exceeding four months, to prepare a report therefrom, but within such time they shall be returned to and remain in the office of such clerk.

Sec. 155. He shall, as soon as practicable after a case is decided, prepare for publication a syllabus of the opinion, a brief abstract of the facts involved, and a statement of the legal propositions made by counsel in the argument; but the argument shall not be reported at length.

Sec. 156. As often as there shall be sufficient matter to constitute a volume of 600 pages, exclusive of the index and table of cases, the reporter shall arrange the same, with a table of cases and an index, and publish the same in a manner and style as neat and substantial as that of the thirteenth volume of Iowa Reports; but the supreme court may increase the size of the volumes when necessary. Two volumes only shall be published in a year.

Sec. 157. The secretary of state shall take for the use of the state 500 copies of each volume of such Reports as soon as published, upon presentation of a certificate signed by a majority of the judges of the supreme court, showing that such volume is prepared and published as provided in this chapter; and shall execute a receipt therefor; upon presentation of which the auditor of state shall draw a warrant on the state treasury in payment for the same at the rate of five dollars per volume. None of said volumes shall be sold or disposed of before the same have been approved by the judges aforesaid.

Sec. 158. The copyright of all Reports prepared or published after the first day of January, A. D. 1875, shall be the property of the state. But the reporter shall own the copyright of all Reports published before that time, and the supreme court may order the publication of a new edition of any volume of which the copyright is owned by the reporter when the public interest requires it, and may require compliance therewith within six months by an order entered of record; and if the reporter neglects or refuses to comply with such order, then such copyright shall be forfeited to the state.

Sec. 159. The copies received by the secretary of state shall be disposed of by him as follows: Two copies of each volume to the library of congress and the library of the supreme court of the United States; one copy to the library of each state and territory in the United States, to each judge of the supreme, district, and circuit courts, to the clerk of the supreme court, and attorney general; fifty copies to the state library, to be and remain therein as a part thereof; and one copy to each county in the state; and twenty copies to the law department of the state university; and twenty copies to the state historical society for exchange in such manner as the proper officers thereof think advisable; and the remaining copies, together with all Reports now in the office of governor, secretary, auditor, treasurer of state, and register of the land-office, and superintendent of public instruction, shall be used by the trustees of the state library in exchange for such books on law or equity, or Reports of other states, as they may select. All books received by such exchange shall be deposited in and become a part of the state library.

Sec. 160. The reporter shall furnish reports to any person desiring the same, at a rate not exceeding five dollars for each volume. For a violation of this section, and upon conviction thereof, he shall be fined two hundred dollars.

(*Act of* 1880.)

CHAPTER 60.

SUPREME COURT REPORTS.

An act to provide for the stereotyping, publishing, and sale of the Supreme Court Reports, and to repeal sections 155, 156, 157, and 160, c. 4, tit. 3, of the Code, and to fix the salary of the supreme court reporter.

*Be it enacted by the General Assembly of the State of Iowa:*

Section 1. That within 60 days after sufficient opinions are announced to make a volume, as herein provided, the supreme court reporter shall furnish and deliver, at his office in Des Moines, Iowa, to the person, persons, or corporation having the contract with the state for publishing the same, copies of such opinions; and with each opinion a syllabus, a brief statement of the facts involved, and the legal propositions made by counsel in the argument, with the authorities cited. But the argument shall not be reported at length; and within 20 days after the proof-sheets for a volume are furnished to him by the publishers, at his office in Des Moines, Iowa, he shall furnish to said publishers an index and table of cases to such volume. The publishers shall furnish to the reporter, without delay, as soon as they shall be issued, two copies of the revised proof-sheets of the opinions, head-notes, indexes, and table of cases of each volume, for correction and approval by the judges of the supreme court, and shall cause such corrections to be made as shall be indicated thereon by said judges. Each of said volumes shall contain not less than 750 nor more than 800 pages, exclusive of table of cases and index, and the workmanship and quality of material shall in every particular be equal to the first issue of volume 40 of the Iowa Supreme Court Reports, and shall be approved and accepted by a majority of the judges of the supreme court.

Sec. 2. The copyrights of all the supreme court reports hereafter published shall vest in the secretary of state for the benefit of the people of this state; but this shall not be construed to prevent the contractor by whom any volume is published, his representatives, or assigns, from continuing the exclusive publication and sale of such volume so long as he or they shall, in all respects, comply with the requirements of this act in respect to the character, sale, and price of such volume.

Sec. 3. The supreme court reporter shall have no pecuniary interest in such reports, but the same shall be published under the contract to be entered into by the executive council with the person, persons, or corporation who

shall agree to publish and sell the same on the terms most advantageous to the people of this state, at a price not to exceed two dollars per volume of the size and quality as provided for in this act. And if any such volume shall, in any way, or from any cause, contain more than 800 pages, no increased or additional price shall be charged therefor.

Sec. 4. The executive council shall, commencing in the first week in April, A. D. 1880, and every eight years thereafter, advertise weekly in six different newspapers in different localities in this state, for the term of six weeks, that sealed proposals will be received at the office of the secretary of state for printing, publishing, and selling the said Reports for the term of eight years next after the first day of June of said year, at a certain rate per volume, to be stated in said proposal, not exceeding the maximum price fixed by this act, and in accordance with the provisions of this act.

Sec. 5. Each bidder shall deposit with the state treasurer the sum of $1,000 before making his proposal, to be forfeited to the state in case he shall not make a contract according to his proposal if accepted, and according to the requirements of this act, and shall take a receipt from said treasurer, and deposit the same with his proposal, and upon entering into the contract herein provided, or upon the proposal being rejected, the said sum shall be returned.

Sec. 6. The successful bidder shall enter into a contract that he will publish the Supreme Court Reports of the state, of the quality, style, and character in all respects as set out in section 1 of this act; that he will publish and deliver to the secretary of state, at the capitol in Des Moines, 250 copies free of cost for publication or delivery, at the earliest practicable time, and within 60 days after the delivery of the manuscripts for any one copy of such Reports to the publishers; that he will stereotype the same, and at all times keep the same on sale in the state of Iowa to residents of this state for actual use at the contract price, in suitable quantities, in the city of Des Moines; that he will furnish the state any number of additional copies that may be required for its own use at the contract price, and procure new stereotype plates whenever the original plates shall become defaced or destroyed; and the said contract shall fully provide for the carrying into effect of all the provisions of this act, and shall be made within 30 days after he is notified of the acceptance of his proposal.

Sec. 7. The successful bidder shall, at the time of making his contract, execute and file with the treasurer of state a bond in the penal sum of $10,000, conditioned to fulfill such contract in all particulars, with at least two sufficient sureties, residents of this state, to be approved by the executive council of the state. Such bond shall, by its terms, be the joint and several obligations of the persons executing it. If the successful bidder shall fail to complete his contract, or shall forfeit the same for any cause, the executive council shall relet the contract as soon thereafter as practicable, in the manner provided in this act: provided, however, that such bidder, in lieu of sureties to such bond, may deposit therewith bonds of the United States, payable to the bearer, amounting to not less than $10,000.

Sec. 8. The contract of the successful bidder required by this act shall contain, among others, the following covenants on his part: *First.* That he will not take out in his own name, nor procure to be taken out in the name of any person other than the secretary of state of this state, a copyright upon any volume of the Supreme Court Reports published under such contract; and that, upon any breach of this covenant, he will pay to the treasurer of this state the sum of $2,000 as liquidated damages. *Second.* That in case it shall be determined in any action upon the bond of such contractor that he has failed in any respect to comply with the provisions of this act or his contract, the executive council may declare the contract forfeited; and that, upon such forfeiture so declared, such contractor will, upon demand, transfer to the secretary of state of this state, for the use of the state, the stereotyped plates

of each volume of such Reports published under such contract, or, in default thereof, will pay to the treasurer of this state $2,000 for each such volume, as liquidated damages for a failure to make such transfer; and such failure shall be deemed a breach of the conditions of such bond, and such liquidated damages may be recovered by action on such bond.

Sec. 9. The supreme court reporter shall receive as his compensation for all services up to the first day of July, 1880, such sums as shall be paid to him by the state under existing laws for the publication of the Supreme Court Reports up to and including volume 51. After the first day of July, 1880, the supreme court reporter shall receive an annual salary of $2,000, payable quarterly, upon the certificate of the judges of said court that he has properly performed the duties of reporter, as required by this act.

Sec. 10. Sections 155, 156, 157, and 160, c. 4, tit. 3, of the Code, and all acts and parts of acts conflicting with the provisions of this act, are hereby repealed: provided, that the passage of this act shall not be construed to affect the publication of the Supreme Court Reports up to and including volume 51; but in all other respects the provisions of this act shall be in force from the time it takes effect, as hereinafter provided.

Sec. 11. This act, being deemed of immediate importance, shall take effect and be in force from and after its publication in the *Iowa State Register* and the *Iowa State Leader*, newspapers published at Des Moines, Iowa, anything in section 33 of the Code to the contrary notwithstanding.

Approved March 18, 1880.

*Cole, McVey & Clarke*, for complainants.

*Geo. B. Young* and *Henry J. Horn*, for defendant West Pub. Co.

*Wright, Cummins & Wright*, for defendant G. B. Pray.

BREWER, J. The complainants insist that the state owns,—is the "proprietor," within the meaning of the term as found in section 4952, Rev. St., of the opinions of its judges; that as proprietor it may take out a copyright in those opinions; that chapter 60, Laws 1880, provides for such copyright; and that the contract transfers the benefit thereof to complainants. They further insist that if not within the scope of the act of congress, the state has a common-law property right in the opinions of its judges; that it can determine how they shall be published; and that having contracted with complainants for exclusive publication, the courts should protect them in the enjoyment of this property right. The defendant insists that there is no such thing as a copyright or other property right in the opinions of the judges; deny that the state ever contemplated claiming or contracting for any exclusive right of publication of the opinions; and claim, further, that if complainants ever had any rights, their laches have been such as to prevent the interference of a court of equity. Obviously, these cross-contentions present three important questions: *First.* The nature and extent of the rights of a state in the opinions of its judges. *Second.* What has the state by its legislation asserted, and what by its contract did it transfer to the complainants? *Third.* To what extent are complainants, by their conduct, estopped from the remedy sought?

1. Has the state, either by virtue of the common law or the copyright acts of congress, any property right in the opinions of the judges of

the supreme court? If this question was submitted to me as a new question independent of prior adjudications, I should unhesitatingly answer it in the negative. If such right exists, it carries with it the right of withholding publication. But it is a maxim of universal application that every man is presumed to know the law, and it would seem inherent that freedom of access to the laws, or the official interpretation of those laws, should be co-extensive with the sweep of the maxim. Knowledge is the only just condition of obedience. The laws of Rome were written on tablets and posted, that all might read, and all were bound to obedience. The act of that emperor who caused his enactments to be written in small letters, on small tablets, and then posted the latter at such height that none could read the letters, and at the same time insisted upon the rule of obedience, outraging as it did the relations of governor and governed under his own system of government, has never been deemed consistent with or possible under ours. This claim seems to rest upon the idea that the state, as an entity independent of its citizens, or as a whole combined of all its individuals, has a property right in the laws and judicial opinions outside of and beyond that vested separately in each citizen. I conceive this to be an error. Each citizen is a ruler,—a law-maker,—and as such has the right of access to the laws he joins in making and to any official interpretation thereof. If the right of property enters into the question, he is a part owner, and as such cannot be deprived of equal access by his co-owners. Could a majority of a legislative assembly debar the minority from participation in the deliberations or a knowledge of the action of the assembly? The majority may bind the minority to the action it determines, but cannot withhold knowledge thereof. So, the majority of the citizens of a state—in a larger sense, the law-makers—may determine the conduct of all; but can knowledge of what is determined be withheld. This, of course, is more emphatically true as to the statutes, but also true as to judicial opinions, which, though not laws, are official interpretations of law. The mere judgment for or against the plaintiff of course decides the case; but that often furnishes little insight into the questions considered and determined. The opinions, at least those of the highest tribunal, are always considered as official interpretations of law, both statute and common, and as such binding upon all citizens. The same argument which supports the state's claim of property in judicial opinions supports that of property in statutes. The state pays the judges, and therefore owns the product of their official toil. The same is true as to legislators. But though such would be my views in the absence of prior adjudications, I find that the English courts generally sustain the crown's proprietary rights in judicial opinions.

The first case in the order of time was that of *Atkins* v. *Stationers' Co.*, decided in the eighteenth year of Charles II., being the year 1666. Atkins, having a patent from the crown, claimed the exclusive right to print law books. The defendants had printed Rolles' Abridg-

ment. A bill was brought by the plaintiff asking an injunction, which the lord chancellor granted. The case was appealed to the house of lords. It was there argued that law reports were the king's property because he pays the judges who pronounce the law. The house of lords took this view of the case, and affirmed the decree below. The case will be found reported in Carter's Report, page 89. On page 91 of the opinion it is said: "The salaries of the judges are paid by the king, and the reporters in all courts at Westminster were paid by the king formerly."

The next case was that of *Roper* v. *Streater*, decided in the year 1672, cited at length in 6 Bac. Abr. 507, and in 10 Mod. 106, and in 2 Show. 260. Roper purchased of the executors of Croke a third part of his reports. Defendant, Streator, had a patent or copyright from the king, and printed these reports. Roper brought action against the defendant for wrongfully printing the reports. Defendant, Streator, pleaded the king's grant as an owner of the copyright, the question being whether the king or Croke was the owner of the reports. The case was decided in the court of king's bench in favor of the plaintiff, and appeal was taken to the house of lords, and the judgment of the king's bench was reversed, upon the ground that the king was the owner of the copyright, and that the executors of the author of the reports could convey nothing. See 4 Burr. 2316; 6 Bac. Abr. 507.

In the case of *Company of Stationers* v. *Parker*, reported in Skinner's Reports, 233, Holt, who argued the case for defendant, said, on page 236, that he agreed that the king had power to grant the printing of books concerning religion and law.

In the case of *Basket* v. *University of Cambridge*, reported in 1 W. Bl. 105, and decided in the year 1758, the court of king's bench held that the right to print the acts of parliament belonged to the king. HALE, C. J., in deciding the case, said: "So the year-books, taken at the expense of the crown, gave the king the property by purchase." The chief justice in this case gives the history of the king's right to print and publish certain books at great length, and says: "The king claimed copyrights of acts of parliament before the grant of Henry VIII., and the copyright of the king was still asserted as well to books of religion as acts of parliament;" and in conclusion, on this subject, the lord chief justice says: "The crown, therefore, has no prerogative at common law over the art of printing, but is merely entitled to especial copyrights."

In the case of *Eyre* v. *Carnan*, decided in 1781, and reported in 5 Bac. Abr. 509, the lord chief baron says: "In the case of *Basket* v. *University of Cambridge* it was held that the right of printing acts of parliament rests in the king."

In the case of *Millar* v. *Taylor*, 4 Burr. 2305, the copyright of the king to all reports and acts of parliament was fully affirmed by Lord MANSFIELD in a very elaborate and able opinion.

Shortt, in the Law of Copyright, on page 36, states that the ex-

clusive right was vested in the king to print the reports of judicial proceedings, statutes, orders of the privy council, translation of the Bible, etc. He further says that the claim of the crown to this copyright has by some been based upon the right of property, by others on naked prerogative; by others on the ground that the expense of the publication is borne by the crown; as to the Bible, that the sovereign is the head of the church. Some of the decisions place the right upon the crown, that the crown is bound to see that correct copies of the Bible, laws, and judicial opinions are furnished the people. Others that the crown pays the judges who pronounce the opinions. Blackstone rests the right on grounds of political and public convenience. The king, he says, as executive magistrate, possesses the right of promulgating to the people the acts of state and government. See 2 Bl. Comm. 410.

In view of this consensus of opinion on the other side of the waters, of the fact that the common law is in force in this country so far as compatible with our system of government and the condition and wants of society, and that a mere change in the locus of the governing power from the crown to the people ought not to work material change in the extent of that power, it may be that due regard for settled law forbids a decision in accord with the views I have expressed.

It is worthy of remark, however, that on this side of the waters the proprietary right of the state in statutes or judicial opinions has never been affirmed, unless in a late case in the supreme court of errors of Connecticut. In it the court says: "The judges and the reporter are paid by the state, and the product of their mental labor is the property of the state, and the state, as it might lawfully do, has taken to itself the copyright." On the other hand, in the case of *Davidson* v. *Wheelock, post,* 61, decided in this district in 1866 by Judge NELSON, the court refused an injunction to restrain the publication of the constitution and the laws of Minnesota as revised and re-enacted by the legislature. In the course of his opinion the learned judge uses this language: "It is true that such compilation may be so original as to entitle the author to a copyright on account of the skill and judgment displayed in the combination and analysis; but such compiler could obtain no copyright for the publication of the laws only; neither could the legislature confer any such exclusive privilege upon him." When we bear in mind the fact that for years law magazines have been constantly printing in advance of official reports opinions of the various courts, the silence of judicial decision is significant of a doubt, at least, whether the doctrine as recognized in England obtains under our system of government.

But I forbear further comment upon this question, and pass to the second.

The contract must be interpreted by the legislation of the state. Nothing passed to complainants save as authorized by statute; and to determine the scope of the act under which this contract was made

we must construe it in connection with other legislation *in pari materia.* The Laws of 1873 prescribed the duties of the clerk of the supreme court, and also provided for the publication of the reports. They directed the clerk to record all opinions as soon as filed, (section 149, *c.* 2, tit. 3, Code Iowa 1873;) required him to permit any one to take a copy; and to himself make and certify a copy when requested, (section 147, Id.) No larger liberty of access could well be given,—no clearer expression of the intent of the legislature to make the opinions free to all. At the same time those laws provided for the publication of the reports and vested the copyright thereof in the state. Section 158, *c.* 4, Id. The publication was given to the reporter, and the contents of each volume were prescribed. In addition to the opinions, he was to prepare and include *syllabi,* abstracts of the facts and law questions in each case, table of cases, and index. Sections 155, 156, *c.* 4, Id. It was this completed volume which was to be copyrighted, a part of its contents being the official interpretations of law by the judges, and the balance mere matters of convenience to the public prepared by the reporter. Construing these different portions of the same statute together, could it be seriously contended that the copyright of the reports nullified or limited the general and unrestricted access to the opinions? Is not the only fair construction that the opinions were to be free to all, and the security of the copyright only cast upon the completed volume? Such would be the construction, under any circumstances; and especially when, as in this case, the matter declared free is the official interpretation of laws,—matter the most general knowledge of which is of vital importance.

Now, the act of 1880 makes no change in the duties of the clerk, repeals no section giving freedom of access to the opinions, and only changes the manner of publishing the Reports. Instead of leaving it with the reporter, it is done by contract. If the opinions were free before, they still are. There is nothing in the act which either directly or by implication asserts on the part of the state a broader or more extensive copyright, or purports to give to the contractor any other rights than were claimed for the state by the Statutes of 1873. How, then, can complainants claim the exclusive right to the publication of the opinions separately? I think the state has made them the common property of all. I indorse fully the language of the learned district judge of the Southern district of Ohio in the case of *Banks* v. *Manchester,* reported in 23 Fed. Rep. 143, and think it pertinent to the case at bar:

"It is in accordance with sound public policy, in a commonwealth where every person is presumed to know the law, to regard the authoritative expositions of the law by the regularly constituted judicial tribunals as public property, to be published freely by any one who may choose to publish them, and such publications may be of everything which is the work of the judges, including the syllabus and the statement of the case, as well as the opinion. The copyright of the volume does not interfere with such free publication.

It protects only the work of the reporter; that is to say, the indexes, the tables of cases, and the statement of points made and the authorities cited by counsel. *Wheaton* v. *Peters,* 8 Pet. 653; *Little* v. *Gould,* 2 Blatchf. 165, 362; *Chase* v. *Sanborn,* 4 Clif. 306; *Myers* v. *Callaghan,* 5 Fed. Rep. 726; S. C. 10 Biss. 139; *Myers* v. *Callaghan,* 20 Fed. Rep. 411."

The conclusion to which I have come upon this second question avoids the necessity of considering the third question.

The application for an injunction will be denied.