## EX PARTE ROBERT A. BROWN, CLERK OF THE SUPREME COURT.

### [No. 20,771. Filed May 29, 1906.]

1. COURTS.—*Officers.*—*Clerk of Supreme Court.*—The Clerk of the Supreme Court is an officer thereof, whose duty is to record the proceedings of such court and keep the papers and records thereof p. 601.

2. SAME. — *Records.* — *Clerk.* — *Control by Court.* — The records and papers in the office of the Clerk of the Supreme Court are subject to the inspection and control of the court, and such clerk, being a ministerial officer, has the right to ask the advice of such court as to his duties. p. 602.

3. SAME. — *Supreme.* — *Inherent Powers.* — The Supreme Court has the inherent power to entertain a petition from its clerk in regard to his duties in reference to its decisions. p. 602.

4. SAME.—*Decisions of Supreme.*—*Control Over, by Clerk*—The Clerk of the Supreme Court has control over the decisions of such court; and the public has only a restricted right to inspect and copy same. p. 603.

5. FEES AND SALARIES.—*Clerk of Supreme Court.*—*Statutes.*— The act of 1895 (Acts 1895, p. 319, §§8, 19, §§6412, 6423 Burns 1901) gives the Clerk of the Supreme Court a stated salary and requires the fees collected to be paid into the state treasury. p. 604.

6. SAME.—*Clerk of Supreme Court.*—*Right to Charge Less than Statutory Rate.*—The Clerk of the Supreme Court has no legal right to charge less than the statutory rate for prescribed official services. p. 605.

7. STATUTES.—*Fees and Salaries.*—*Copies of Records.*—*What Are.* —*Evidence.*—The statute (§7798 Burns 1901, §5831 R. S. 1181), providing that the Clerk of the Supreme Court shall charge "for every copy of record * * * per one hundred words, * * * ten cents" refers to certified copies admissible in evidence under §466 Burns 1901, §462 R. S. 1881, and not to uncertified or carbon copies. p. 607.

8. SAME.—*Construction.*—*Contemporaneous Affairs.*—Courts will consider affairs contemporaneous with the passage of a statute in the construction thereof. p. 608.

9. MANDAMUS.—*Clerk of Supreme Court.*—*Uncertified Copies of Decisions.*—The Clerk of the Supreme Court cannot be com-

pelled by mandate to furnish any person uncertified copies of decisions of such court.   p. 608.

10.   STATUTES.—*Construction.—Subsequent Kindred Statutes.*— In the construction of a statute the courts may consider subsequent statutes involving the same subject-matter.   p. 608.

11.   FEES AND SALARIES.—*Clerk of Supreme Court.—Uncertified Copies of Decisions.*—The Clerk of the Supreme Court may lawfully contract for furnishing uncertified carbon copies of the decisions of the Supreme Court at a less rate than certified copies, there being no statute covering same.   p. 609.

12.   COURTS. — *Supreme and Appellate. — Decisions. — Right to Publish.*—Any person has the right to publish the decisions of the Supreme and Appellate Courts.   pp. 609, 610.

13.   SAME. — *Supreme and Appellate.—Decisions.—Copyright.*— The decisions of the Supreme and Appellate Courts cannot be copyrighted, but the syllabi may be.   p. 610.

Original Petition by Robert A. Brown, as Clerk of the Supreme Court. *Petition sustained.*

*Robert A. Brown, pro se,* and *George H. Batchelor,* for petitioner.

*Charles W. Miller,* Attorney-General, *C. C. Hadley, H. M. Dowling* and *William C. Geake, contra.*

JORDAN, C. J.—The petitioner, Robert A. Brown, Clerk of the Supreme Court and *ex officio* Clerk of the Appellate Court, comes in person and by counsel and presents a petition for our consideration, whereby he invokes our judgment as a court relative to his control over the opinions and decisions of said court after the same have been handed down and filed in his office. He also requests to be advised whether, under the existing law, he is at liberty, in his discretion, to continue to furnish in the future, as he has been doing in the past, uncertified copies of said opinions and decisions to the West Publishing Company for advance publication in what is known as the Northeastern Reporter. He alleges and shows in his petition that he is the duly elected, qualified and acting clerk of this court, and an officer thereof and to an extent subject to the control of the court. The petition alleges that §6423 Burns 1901,

Acts 1895, p. 319, §19, provides that "it shall be the duty of the Clerk of the Supreme Court to tax and keep an accurate account on proper fee books, of all fees and charges of his office as is required by this act or any other laws of the State for any and all services performed by him or his deputies, clerks or assistants, and on the first Monday in January and the first Monday in July of each year, he shall make and file in the office of the Treasurer of State a statement and report, subscribed and sworn to, showing the amount of such fees and charges collected and uncollected, and the names of parties liable therefor, and from whom received, and the balance due, and the whole amount of fees and charges collected by him shall be paid into the state treasury;" that said section is a part of the general fee and salary law of 1895, and that said law of 1895 provided no schedule of fees to be charged by said clerk, and made no provision requiring him to collect fees, other than what might be contained in laws in force at the time of the passage of said act; that the only law at the time of the enactment by the legislature of the provisions embraced in §6423, *supra,* aside from the statute relative to docket fees, was §7798 Burns 1901, §5831 R. S. 1881, which is a part of the fee and salary act of 1879 and provides that the fees of the Clerk of the Supreme Court shall be as follows: [here the petition sets out in full the schedule of fees as set forth in said section]. It is further alleged that said fee and salary act of 1879 provided no salary or compensation for the Clerk of the Supreme Court other than the fees therein prescribed, which were to compensate him for official services rendered; "that nothing in said act prohibited said clerk from charging a less amount than the sums therein designated, for any services rendered, or prevented him from performing said service without any compensation whatever, if he so desired to do; that the act of 1895 above mentioned, fixing a stated salary for said clerk, contained no provision requiring or compelling the clerk

to collect the fees designated in said act of 1879, other than might be contained in said act of 1879 itself; but, on the other hand, said act of 1895 does contain provisions requiring the Secretary of State, the Auditor of State, and county officers to collect and account for the fees allowed by law; that relying upon his belief that under said acts of 1879 and 1895 he was not required to make any specified charge for the service, and that such charge was a subject which could be properly agreed upon and determined by private arrangement, subject to the requirement that any amount so received should be covered into the state treasury; and the further belief that such service could not have been contemplated by said act of 1879, he did, on or about November 22, 1898, begin furnishing to the West Publishing Company, of St. Paul, Minnesota, for publication in the Northeastern Reporter, copies of all the opinions rendered by the Supreme and Appellate Courts, and continued to furnish said copies until January 1, 1906, at a less rate than ten cents per one hundred words, accounting to the Treasurer of State for the amounts received therefor under §§6406a, 6423 Burns 1901, Acts 1901, p. 399, Acts 1895, p. 319, §19; that said Northeastern Reporter was not in existence at the time of the passage of the act of 1879; that the West Publishing Company was unknown, and that at said time there was no practice in vogue of furnishing copies of opinion for commercial purposes or to legal publications; that by law it is made one of the duties of said clerk to certify a copy of every opinion to the clerk of the lower court from which the appeal was taken; that the copies furnished the West Publishing Company, as aforesaid, are not original copies, but are uncertified carbon copies, made upon a typewriting machine at the time the opinion is copied for certification, without any additional labor or expense to the office, except for the paper upon which they are made, and the carbon necessary to make them; that at the time of the passage of said act of 1879

typewriting machines were not in use, and carbon copies were unknown; that all copies were at that time made in longhand, and that a charge of ten cents per one hundred words was not unreasonable therefor; but he does say that such a charge for an uncertified carbon copy is unreasonable, not only because it is out of proportion to the labor and expense required to make it, but also because it is uncertified, and the copy from which the carbon copy is made is taxed to the losing party at the rate of ten cents per hundred words, as part of the costs in the case.

"He further shows to the court that some doubt having been raised as to his right to enter into an agreement with said publishing company to furnish said copies at a less ráte than ten cents per one hundred words, he notified said company that said copies would not be furnished for a less rate after January 1, 1906; that he is informed and believes that said company regards said rate as unreasonable and prohibitive, and that unless said copies can be obtained in some other manner the publication of said opinions in the Northeastern Reporter will be suspended, the bench and bar of the State and this honorable court deprived of the use of the same, and the administration of justice greatly hampered; that in order to procure said opinions without paying a rate which it so alleges is unreasonable, extortionate and prohibitive, said company is asserting that said opinions are public records, to which any person has the right of access, and, desiring so to do, may copy without charge, and is threatening, and will, unless prevented from so doing, place in the office of said clerk a hired copyist to make copies of the opinions for it; that by law said clerk is made the custodian of the records of this court, and is required to preserve them and hand them over to his successor; that the care of such records and their condition, as well as the entries therein made, are subject to the inspection and control of this honorable court under §§1332, 7796 Burns 1901, §§1308, 5829 R. S. 1881; that this

honorable court also has a direct interest in the conduct of the business of said clerk's office, to the end that its records be made up expeditiously and accurately, and its opinions preserved and recorded as rendered; that the placing of a copyist in his said office by said company for the purposes aforesaid, not only would result in great danger. of the mutilation and loss of said records, but would seriously inconvenience, hinder and delay the work of the office, and the proper making up of the records of this court; that if said company has the right it asserts to place its copyist in said office, to copy said opinions, the work must of necessity be done under the immediate eye and observation of the clerk or his deputies, else he would not be able to see to it that said records were safely preserved for transmission to his successor; that so to supervise said copyist and see that said records were preserved without mutilation would require a great portion of the time of the clerk and his deputies, and greatly hinder and impede the work of the office, and even then the danger of the mutilation and loss of said opinions would be so great that it would be impossible to provide entirely against it, even with the closest scrutiny and care;    *    *    *    that if your said clerk, in the exercise of his said duties of preserving safely the records of this court, is not compelled personally to supervise the work of said copyist, his constant presence in the office of said clerk would create an intolerable condition, as well by having in his possession opinions when they would be desired by others, or by the employes of said office, as by the confusion which would naturally result, and the menace to the safety and verity of the records; that if said copyist has the right of access to said records for the purpose of making copies thereof, then it might devolve upon the clerk to furnish him with all reasonable facilities for so doing, such as procuring the records for him, and furnishing proper tables, etc., upon which to do the work; and if said copyist has the right to bring pen and ink into said

clerk's office for such work, then it might follow, and would probably be claimed, that he had the right to bring in a typewriting machine for such purpose; that if said right exists for said company it exists for all others, so that the time of all the force is subject to be so employed, the whole office so occupied and converted into a veritable bedlam of confusion, so that the business of the office would cease, or be transacted in an ill manner until the legislature could provide more assistance and larger quarters, or this court relieve the situation by proper order; that said menace is a present one, and said clerk should be advised in advance as to his rights and duties in the premises, and his authority to forbid said copyist access to the records, and to provide rules and regulations governing the examination of the same; that said publishing company has no special interest in any particular opinion, but its only interest is to have copies of all opinions for commercial purposes, and to publish them in said Northeastern Reporter.

"He further shows to the court that said Northeastern Reporter has a large circulation among the bench and bar of this State, by reason of the fact that the decisions of the Supreme and Appellate Courts are published therein many months before they appear in the official state reports; that in truth and in fact said publication has become a legal necessity not only to the bench and bar of this State generally, but also to this honorable court, and that great hardships, inconvenience and expense would be entailed upon the bench and bar of the State, as well as upon this honorable court, if the opinions of the Supreme and Appellate Courts are not published therein.

"He further says that if he has the right so to do, or if this court can so order him, he will gladly, as an accommodation to the bench and bar of this State, furnish said copies to said publishing company at cost, or at such price as could be determined upon with said company, rather

than be forced to submit to the danger, inconvenience, and confusion resulting from the handling of said opinions by said copyist; and that this honorable court, if not prevented from so doing by any statute, has such an interest in the preservation of its records, and in the publication of said opinions in said Northeastern Reporter, that it should so direct him to do; that if said clerk has the right to enter into an agreement with said company to furnish said opinions at a less rate than ten cents per one hundred words, said company can be prevented thereby from placing a copyist in said office, and the condition aforesaid likely to arise avoided; that said clerk is in doubt as to his rights in the premises, especially as to his right to make such an agreement and as to his right to prevent said copyist from making copies as aforesaid; and if he has no right to enter into such an agreement, or this court has no power to order said copies transcribed for the use and benefit of said company, and if he has no right to prevent said copyist from making said copies, then he is in doubt as to his rights in furnishing facilities for said work, and his duties in supervising it. Wherefore, your petitioner, presenting said circumstances to the attention of this honorable court, doth pray for such direction as this court may deem fit to give."

The Attorney-General has appeared to this proceeding and filed a brief in opposition thereto. With much earnestness he denies our right or power to entertain the petition herein, or to give any opinion upon any of the questions upon which the clerk thereby seeks to invoke our judgment. It is urged that we have no jurisdiction of the subject-matter, the contention being that this court's authority over its records does not extend to the direction of the clerk to sell or furnish copies of its opinions for publication at any particular price; neither is it invested with the power to direct its clerk in regard to contracts to be made by him with third parties for supplying them with copies of the court's opinions.

As we view the petition, however, this is not its theory or purpose. It does not purport to invoke the exercise on the part of this court of any such power. Or in other words, the clerk does not in any manner seek or demand that we direct or require him involuntarily to do anything, or that we in any way prescribe any official duty for his performance. The petition fully discloses that the purpose or object of the clerk in presenting it is to be advised by the court in a controversy which has arisen between him and the West Publishing Company relative to the use of the opinions and decisions of this and the Appellate Courts on file or of record in his office.

The principal question apparently upon which he seeks our advice, or opinion, is: Is he, as the clerk of this court, under the law, at liberty to furnish to said company uncertified copies of the opinions and decisions in question at a rate of less than ten cents per one hundred words, as prescribed by §7798 Burns 1901, §5831 R. S. 1881; and to be further advised as to his right under the circumstances, as shown, to prevent said company from placing in his office a copyist, and thereby exercise the right which it asserts of obtaining transcripts of the opinions and decisions in controversy. Or in other words, the clerk in his petition in effect asks that we interpret, or construe, for his guidance, the provisions of the statute of 1879, and determine whether he is controlled thereby in furnishing to said company the uncertified carbon copies of our opinions and decisions as he did prior to January 1, 1906.

The clerk of this court is an officer thereof, and in the discharge of his duties in the making up and safe-keeping of our records he may be considered as an arm thereof. He is charged by law with the duty of entering and recording the proceedings of the court and of safely keeping all the records and papers belonging to his office, and he may, by rule of court, be required to perform such official duties. In fact, in recording and

making up the proceedings of the court he may be said to act as its amanuensis, subject to its control. 7 Cyc. Law and Proc., 219, 223.

The records of this court, so far at least as necessary to the administration of justice, are subject to the control of the court. On this proposition see the admirable opinion of Justice Field, in *Houston* v. *Williams* (1859), 13 Cal. 24. The duty is enjoined upon our clerk to attend the terms of the court in person or by deputy; to issue all processes emanating from the court and to attest the same with its seal. He is required to certify its opinions and decisions to the lower court from which the cause was appealed. §§7792, 7795 Burns 1901, §§5825, 5827 R. S. 1881. The records of his office which, under the law, are committed to his custody, are all subject to our inspection. §7796 Burns 1901, §5829 R. S. 1881. While the clerk of this court is a ministerial officer only and the functions which he performs are wholly of that character, still he is a ministerial officer of the judicial department, and it would certainly appear as a logical conclusion, under all the circumstances, that this court is the proper tribunal to which its clerk may apply for advice in matters pertaining to his office of the character of those herein involved.

The court's opinions and decisions, when filed in the office of its clerk, become records and papers therein and their safe-keeping and proper control are certainly matters with which the court is concerned. In *Ex parte Griffiths* (1889), 118 Ind. 83, the official reporter of the decisions of this court, by his petition, successfully invoked its judgment in relation to the validity of an act of the legislature which imposed upon the court instead of the reporter the duty of preparing syllabi of the decisions reported. In the proceedings at bar, as we have previously shown, the clerk invokes our judgment, or opinion, as to the proper construction or interpretation of

the provisions of the statute fixing, or prescribing, the fees to be charged for copies of the records, or papers, on file in his office. There certainly can be no substantial or reasonable distinction made between the case of *Ex parte Griffiths, supra,* and the one at bar to show that this court had the power to entertain and consider the petition in the former but is not invested with such power in the latter case. In respect to our right to entertain the petition herein and consider the essential matters therein presented, we have no doubt. In doing so, however, we do not depend upon any right or power conferred by the legislative department, but rely upon and exercise only the power with which we as a court are inherently invested. Elliott, App. Proc., §45. In so holding we believe that we are well within and fully sustained by the precedents of this court in *Ex parte Griffiths, supra; Ex parte Sweeney* (1892), 131 Ind. 81; *Ex parte Sweeney* (1891), 126 Ind. 583. See, also, the following authorities: *In re Post* (1839), 3 Edw. Ch. (N. Y.) *365; *United States* v. *McCandless* (1893), 147 U. S. 692, 37 L. Ed. 334; *Board, etc.,* v. *Stout* (1893), 136 Ind. 53; *In re Janitor of Supreme Court* (1874), 35 Wis. 410.

The unrestricted or unconditional right to make transcripts of our opinions and decisions which, as the petition shows, the West Publishing Company is asserting and threatening to exercise, cannot be recognized or sustained. The clerk of this court not only has the right, but it is his duty, to control by reasonable rules, to which all persons must yield obedience, the searching, inspection and handling of the records, papers and documents of his office. This principle is fully recognized in *State, ex rel.,* v. *King* (1900), 154 Ind. 621. Certainly no person unofficially can be accorded the unrestricted right or privilege of going into the office of the clerk and there, according to his own volition, copying the opinions and

decisions of this court.   *Welling* v. *Merrill* (1876), 52 Ind. 350, 355.

It does not appear that the West Publishing Company is demanding that the clerk shall furnish it with certified copies of our opinions and decisions at a rate less than the maximum fixed by the statute, but it seemingly is content to continue to purchase for a reasonable compensation the uncertified carbon copies in controversy which it utilizes for advance publication.   And it is only in the event that the clerk continues to exact of it for the uncertified copies in question like fees as are charged for certified transcripts of the records and papers belonging to his office that it proposes to assert the right to have copies of our opinions and decisions made by its own agent for publication.   The petition, however, shows that the clerk is ready and willing to furnish uncertified carbon copies to said company as he formerly did for such a reasonable price or compensation as may be mutually agreed between him and the company and to account for and turn over to the Treasurer of State the money so received by him.

The cardinal question which confronts him, however, is, must he be governed in charging for such uncertified copies by the schedule prescribed by the fee and salary law of 1879?   Acts 1879 (s. s.), p. 130, §15, §7798 Burns 1901, §5831 R. S. 1881.   There is no attempt or effort on the part of the clerk in this proceeding to have the court order or direct him to furnish to said publishing company the copies in controversy, but, as previously said, all that he requests is that we place an interpretation, for his guidance in the matter, upon the provisions of the statute about which he is in doubt.

Referring to §7798, *supra,* the provisions of which appear to have been continued in force, we find that it provides that "the fees of the Clerk of the Supreme
5.   Court shall be as follows:  *  *  *  For every copy of record or other paper, per one hundred

words (four figures counting as one word), or if the whole number of words in such copy be less than one hundred words, ten cents. * * * For certificate and seal, forty cents." These are the only items in the schedule which require consideration. The fees therein fixed or prescribed were originally intended for the sole benefit of the clerk, and afforded him a compensation for service performed in the discharge of his official duties. By the salary act of 1895 the clerk of this court was placed upon what may be termed a flat salary and the method of compensating him alone by fees was wholly abrogated and he was required under the law to pay into the state treasury all fees and charges of his office. §§6412, 6423 Burns 1901, Acts 1895, p. 319, §§8, 19.

By the provisions of section four of each of the appropriation acts passed by the respective legislatures of 1901 (Acts 1901, pp. 377, 399), 1903 (Acts 1903, pp. 361, 382) and 1905 (Acts 1905, pp. 497, 516) it was made the duty of the Clerk of the Supreme Court, and other state officials therein mentioned, to report quarterly all amounts of money received for certified copies of official records, opinions or papers, etc., and pay the money so received into the state treasury. By the change in the method of compensating the clerk of this court by a fixed salary instead of fees, and requiring the latter when collected to be paid into the state treasury, the State has, in effect, been substituted for the clerk in respect to the ownership and right to the fees arising out of the official services performed by him or his deputies. Therefore, he no longer has the authority or right, as he had when the fees belonged to him, to tax or charge fees for his official services at a rate less than the maximum prescribed by the statute, hence it is essential to the proper administration of the affairs of his office that he be advised as to what duty the law exacts of him, if any, in furnishing the copies in question to the West Publishing Company.

It appears that the copies which the clerk, prior to January 1, 1906, furnished to said company and those which he is ready and willing to continue to supply, are nothing more than uncertified carbon copies which are prepared at the same time and as a part of the same work of making copies of the court's opinions to be certified to the lower court from which the appeal in each particular case has been taken. For the copies certified down the maximum rate is taxed and charged for the benefit of the State, to which is added the fee prescribed for the certificate and attestation by the seal of the court. These carbon copies which are furnished to the West Publishing Company are in no manner authenticated by the certificate of the clerk under the seal of the court. They may possibly with propriety be termed a by-product or matter arising out of the typing of the copies certified to the lower courts.

It is argued by the Attorney-General that the words in the schedule of fees (§7798 Burns 1901, §5831 R. S. 1881), namely "for every copy of record or other paper, per one hundred words, * * * ten cents," etc., cannot be interpreted or held to mean or refer only to certified copies duly authenticated, but mean any copy, certified or otherwise. We cannot yield our concurrence to this view of the question, for, as it seems to us, such an interpretation or construction would be unreasonable and absurd. Section 466 Burns 1901, §462 R. S. 1881, provides that copies of records, etc., kept in any public office in this State shall be proved or admitted as legal evidence in any court or office in this State when attested by the keeper of such records, with the seal of his office affixed as a part of such attestation. By this section officers having the custody or charge of public records or papers are authorized to make certified copies thereof. In the performance of such official services the time when the records or papers in question came into ex-

istence, whether during the term of the officer certifying or prior thereto, is not material. *Painter* v. *Hall* (1881), 75 Ind. 208; *Midland R. Co.* v. *State, ex rel.* (1894), 11 Ind. App. 433.

It was held by this court in *Donellan* v. *Hardy* (1877), 57 Ind. 393, 403, that the fact that a particular judgment or decision had been rendered by the Supreme Court, could only be proved by a transcript thereof, authenticated by the certificate of its clerk and attested by the seal of the court, or by the record of such certified transcript if the same had been recorded in the order-book of the lower court. It is evident, and certainly beyond successful controversy, that the legislature, in authorizing the clerk of this court to charge a fee of ten cents per one hundred words for every copy of record or other paper, meant and intended a certified copy, one duly authenticated as required by law. It certainly did not intend or in any sense mean an unofficial or uncertified copy, a document or paper which could have no legal effect or standing whatever as legitimate evidence or proof of any fact. Such a copy, generally speaking, would be of no particular use or value. What the legislature meant and intended was a duly authenticated copy, as required by the provisions of the law and the decisions of the court to which we have referred. 24 Am. and Eng. Ency. Law (2d ed.), 200, 208. The words "copy of any record or paper on file" contained in the statute, as generally construed or interpreted, mean a certified copy. This interpretation the authorities fully sustain. In *Muirhead* v. *United States* (1877), 13 Ct. Cl. 251, 256, the court, in construing a federal statute in regard to supervisors of election, said: "The words 'copy of any paper on file' mean a copy certified and issued by the supervisor as a copy." See, also, Sweet's Law Dict., p. 204.

As a general rule a statute is to be construed in reference to the condition of affairs at the time of its passage. When

the fee and salary act of 1879 was enacted neither

8.    the West Publishing Company nor any person in like manner was engaged unofficially in publishing the opinions and decisions of this court.    The West Publishing Company did not enter upon that work in this State for several years thereafter.    In fact, at that time the bar and public in general were advised in regard to the decisions of this court, in advance of the official reports, only by abstracts thereof which were published in the daily newspapers.    Under the circumstances it would be unreasonable to assume that the legislature, in fixing or prescribing a maximum fee or price that the clerk might exact for a copy of record or paper, also intended to include such copies as the clerk shows he has been furnishing to said company for advance publication.

As a legal proposition it certainly will not be contended that the clerk of this court, in the event he should refuse to furnish to said company the uncertified copies in

9.    question, could, under existing laws, be coerced by mandamus.    That the phrase "copy of record," etc., as expressed in the schedule of fees, means a certified copy has been repeatedly recognized by the legislature in the provisions incorporated in the several appropriation acts to which we have already referred.

It will be noted that these several provisions, among other things, provide that the Clerk of the Supreme Court and the other state officials therein mentioned, be-

10.    fore receiving their quarterly salary, are required to pay over to the Treasurer of State the amounts of money received for "certified copies of the official records, opinions or papers," etc.    We are aware that an interpretation or construction of a statute by a subsequent legislature is, as a rule, not entitled to much weight, for the functions of that body are to enact and not to construe law.    But if the word "copy" contained in the fee schedule

in question could be said to be of a doubtful or uncertain meaning, these provisions in the subsequent acts of the legislature would be entitled to some weight as a guide in the interpretation of the meaning of the word "copy" in the fee schedule of the act of 1879. *Henderson* v. *State, ex rel.* (1884), 96 Ind. 437, 442; *Middleton* v. *Greeson* (1886), 106 Ind. 18.

As the provisions in question of the act of 1879 do not apply to or control the clerk in charging or fixing a compensation for furnishing uncertified or unauthenti-

11. cated copies of the opinions and decisions in controversy, it follows, therefore, that under the present condition of our laws there is an entire absence of any statutory provision governing or restricting him in the matter.

The Attorney-General, in his opposing argument, concedes that, in the absence of any legal restriction or requirement, the clerk is the exclusive judge of the

12. manner of furnishing copies of these opinions. He finally contends, however, that the clerk has no right to furnish copies of the opinions and decisions of the Supreme and Appellate Courts to the West Publishing Company for advance publication, for the reason that the State has a property interest therein, and, therefore, is invested with the exclusive right of their publication. The argument is advanced that inasmuch as the State has undertaken officially to publish these decisions, consequently other persons are impliedly precluded from unofficially publishing them. It is true that §6 of article 7 of our Constitution provides: "The General Assembly shall provide, by law, for the speedy publication of the decisions of the Supreme Court made under this Constitution; but no judge shall be allowed to report such decisions." This provision, however, cannot be said to have the effect of prohibiting other persons from unofficially

publishing our decisions. In fact, the State has never claimed the right to monopolize the publication of these decisions.

By the above provision of our fundamental law the framers, or molders, thereof recognized not only the importance of having the decisions of the highest court 13. of this State published, but they recognized also the necessity of a speedy publication thereof in order that the people of the State might be advised or informed as early as possible as to the law declared or construed by the highest court. It is generally settled by the authorities that the work of the judges of a court cannot be copyrighted, but that the syllabi, or head-notes, of the opinions and decisions of the court as reported, prepared by the official reporter, may be protected by copyright. *Ex parte Griffiths, supra; Banks* v. *West Publishing Co.* (1886), 27 Fed. 50, 57; *Banks* v. *Manchester* (1888), 128 U. S. 244; 7 Am. and Eng. Ency. Law (2d ed.), 539, 540.

The policy of the State to permit persons other than the official reporter to publish in advance the decisions of this court has been clearly recognized through its legisla- 12. ture. In section seven of an act passed in 1877 (Acts 1877 [s. s.], p. 64, §5710 R. S. 1881), providing for the election of a reporter of the decisions of this court, and fixing the price that might be charged per volume therefor, and giving the reporter the exclusive copyright of each volume published by him, it is expressly provided or declared "that nothing in this act be so construed as to prevent any newspaper of this State from publishing any opinion or abstract of any decision of said court."

In *Welling* v. *Merrill* (1876), 52 Ind. 350, 355, this court affirmed that any person could print, publish and sell the reports of the decisions of this court by purchasing the transcripts thereof from the clerk. While it cannot be said that these decisions are the law of the State, nevertheless they are the evidence or exposition of what this court con-

strues the law to be, and as such are binding upon all people within the State. *Center School Tp.* v. *State, ex rel.* (1898), 150 Ind. 168.

Turning to the decisions of other courts we find that the Supreme Court of the United States, in *Banks* v. *Manchester, supra,* said: "The whole work done by the judges constitutes the authentic exposition and interpretation of the law, which, binding every citizen, is free for publication to all, whether it is a declaration of unwritten law, or an interpretation of a constitution or statute." See, also, *Nash* v. *Lathrop* (1886), 142 Mass. 29, 6 N. E. 559. In the latter case the court said: "The decisions and opinions of the justices are authorized expositions and interpretations of the laws which are binding upon all the citizens. They declare the unwritten law, and construe and declare the meaning of the statutes. Every citizen is presumed to know the law thus declared, and it needs no argument to show that justice requires that all should have free access to the opinions, and that it is against sound public policy to prevent this, or to suppress and keep from the earliest knowledge of the public the statutes or the decisions and opinions of the justices. Such opinions stand, upon principle, on substantially the same footing as the statutes enacted by the legislature."

In *Banks* v. *West Publishing Co., supra,* Justice Brewer presents the question as follows: "It is a maxim of universal application that every man is presumed to know the law, and it would seem inherent that freedom of access to the laws, or the official interpretations of those laws, should be coextensive with the sweep of the maxim. Knowledge is the only just condition of obedience. The laws of Rome were written on tablets and posted, that all might read, and all were bound to obedience. * * * The majority of the citizens of the state—in a large sense, the lawmakers —may determine the conduct of all; but can knowledge of what is determined be withheld? This, of course, is more

emphatically true as to statutes, but also true as to judicial opinions, which, though not laws, are official interpretations of law.  *  *  *  The opinions, at least those of the highest tribunal, are always considered as official interpretations of law, both statute and common, and as such are binding upon all citizens. The same argument which supports the State's claim of property in judicial opinions supports that of property in statutes. The State pays the judges, and therefore owns the product of their official toil. The same is true as to legislators.  *  *  *  It is worthy of remark, however, that on this side of the waters the proprietary right of the state in the statutes or judicial opinions has never been affirmed, unless in a late case in the supreme court of errors of Connecticut."

It is a well-known fact that for many years in this jurisdiction law magazines and newspapers have exercised the right of publishing in advance of the official reports decisions of the higher courts. Not only is this true in this State, but likewise in respect to the decisions of the higher courts of other states. This right so far as we are aware has never been denied or in any manner controverted by this State, but on the contrary, as we have shown, has been expressly recognized by the legislature. The work of the West Publishing Company in placing the opinions and decisions of this and the Appellate Court in the hands of the bar and public, at an early date after they have been handed down, is to be commended. It would certainly not be in harmony with the policy of this State, as minfested by it in the past, for this court to hold that the West Publishing Company, under existing laws, should be denied the right of obtaining copies of the opinions of this and the Appellate Court for publication in advance of the official reports. Such a holding would virtually serve in effect to suppress or withhold any advance publication of these decisions, as said company is now engaged in doing, and would thereby deprive the bar and the people of this

State from being early advised in regard to the law to which they are required to yield obedience as declared or construed by the higher courts.

As a final conclusion upon the matter herein involved we express our judgment that the clerk of this court, under the circumstances, is, in his discretion, at liberty to furnish to said West Publishing Company for publication the uncertified or unauthenticated carbon copies in question at and for a price or compensation less than ten cents per one hundred words. It is clear that at present there are no legal restrictions upon his right in this respect to the contrary. The petition herein is sustained at the cost of the petitioner.